UNITED STATES of America,
Plaintiff–Appellee,

v.

Carolyn Sue JOHNSON, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Trisha Ranae WOOD, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Kristy Ann BRECK, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Ulualoaiga EMELIO, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Angela BARACCO, Defendant–Appellant.

Nos. 90–30344, 90–30348, 90–30366,
90–30370 and 90–30373.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 11, 1991.

Decided Feb. 11, 1992.

George G. Curtis, Portland, Or., for defendant-appellant Carolyn Sue Johnson.

Robert Reid, Bates, Smucker & Reid, Portland, Or., for defendant-appellant Trisha Ranae Wood.

Jenny Cooke, Portland, Or., for defendant-appellant Kristy Ann Breck.

Michael Norris, Portland, Or., for defendant-appellant Ulualoaiga Emelio.

Susan Elizabeth Reese, Reese and Goffredi, Portland, Or., for defendant-appellant Angela Baracco.

Frank Noonan, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before GOODWIN, SCHROEDER and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Carolyn Sue Johnson, Trisha Ranae Wood, Kristy Ann Breck, Ulualoaiga Emelio, and Angela Baracco were convicted of a variety of drug offenses. All of them appeal. We affirm all of the convictions, but remand all of the cases for resentencing.

## BACKGROUND

These cases arise out of a drug ring run in Portland, Oregon by Daniel Longoria, Sr. He was the kingpin. His son, Daniel, Jr., operated as an assistant. A group of large, rough men, collectively known as "The Samoans," although some were of other origin, acted as the boss's bodyguards, enforcers and collectors. Emelio was one of this group. At the lowest level of the structure were a number of women, some of whom are the defendants here.

The testimony presented at trial and the verdict of the jury leave no doubt that the defendants did the things with which they are charged. The issues raised on appeal go to rulings of the court which affected either the defenses offered or the sentencing. The dominant issue on the appeals of Breck, Johnson and Wood is the duress defense as it interacts with sentencing.

The Defense of Duress

The defense of duress is a common law concept that federal criminal law has incorporated. *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). The defense assumes that the defendant has voluntarily performed the criminal act; his or her will has not been so overcome that another choice was impossible; the act done was intentional. As the defense has been phrased in standard, but not completely comprehensive, terms in this circuit:

> There are three elements of the duress defense: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm.

*United States v. Contento–Pachon*, 723 F.2d 691, 693 (9th Cir.1984).

The formula is addressed to the impact of a threat of force upon a reasonable person: The fear must be "well-grounded." There must be no "reasonable" opportunity to escape. The formula is in harmony with the analysis of duress in the Model Penal Code which recognizes duress in the use of unlawful force "that a person of reasonable firmness in his [or her] situation would have been unable to resist." American Law Institute, *Model Penal Code* § 2.09(i) (1985).

■ In determining if the fear was "well-grounded," the defense does permit the fact-finder to take into account the objective situation in which the defendant was allegedly subjected to duress. Fear which would be irrational in one set of circumstances may be well-grounded if the experience of the defendant with those applying the threat is such that the defendant can reasonably anticipate being harmed on failure to comply.

■ The question, relevant to the defense of duress in the cases before us, is whether a special vulnerability to fear—a vulnerability not produced by those persons causing the defendant's criminal action—may be taken into account. As a defense to a charge of criminal conduct, such subjective vulnerability has not been admitted. Here, as elsewhere in the criminal law, there is "an unwillingness to vary legal norms with the individual's capacity to meet the standards they prescribe, absent a disability that is both gross and verifiable." *Model Penal Code,* § 2.09 comment 2. "Stark, tangible factors that differentiate the actor from another, like his [or her] size, strength, age, or health, would be considered in making the exculpatory judgment." *Id.* at comment 3. As has been evident by the need to add the personal feminine pronoun in quoting from the Model Penal Code, its makers apparently did not consider gender as one of the "stark, tangible factors." As will be seen, however, there are sets of circumstances in which gender is also a factor to be considered.

■ Moreover, a purely subjective element that cannot be taken into account in determining criminal liability may be taken into account in sentencing. *Id.,* comment 2; LaFave and Scott, *Criminal Law* (Rev. ed. 1986) § 5.3(d). Federally, the Sentencing Guidelines specifically provide for the possibility of downward departure if the defendant "committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." U.S.S.G. § 5K2.12. The Commission's Policy Statement on this guideline declares: "The extent of the decrease ordinarily should depend on the reasonableness of the defendant's actions and on the extent to which the conduct would have been less harmful under the circumstances as the defendant believed them to be." The perception of the particular defendant thus must be taken into account.

Evidently the Commission had in mind the showing of duress less than what constitutes a defense to a crime; for if the defense were "complete," there would have been no crime requiring a sentence. *United States v. Cheape,* 889 F.2d 477, 480 (3d Cir.1989). Consequently, it has been held that the injury threatened need not be imminent and may include injury to property; and there need not be proof of inability to escape. *Id.* Moreover, the Commission emphasizes not only "the reasonableness of the defendant's actions" but "the circumstances as the defendant believed them to be." U.S.S.G. § 5K2.12. The latter clause directs the sentencing court's attention to the defendant's subjective evaluation of the circumstances in which the defendant was placed.

With these principles and precedents in mind, we turn to the cases at hand.

The Duress Defense In Relation To Wood.

■ According to Trisha Wood's testimony, she began to work for Longoria only after he had hit her in the face and one of his enforcers had thrown her across the room. Given the violence that she had already observed on the part of Longoria, including his putting of dynamite in her housemate Kathy King's mouth, she was under threat of immediate severe physical harm. She tried to escape three times.

The first time she was caught her life was threatened. The second time she was subjected to severe physical abuse. The third time Longoria put a gun in her mouth and also threatened to kill her daughter. If Wood's testimony were believed, she met the strictest test for having been under duress.

The court so charged the jury. But the jury either did not believe Wood's story or at least did not believe that she was without reasonable opportunity to escape. The jury convicted her of the single count with which she was charged, distribution of heroin on September 14, 1989.

Wood's conviction must stand, but duress remains relevant. In imposing sentence, the court took into account all the drugs that she had distributed while working for Longoria from July 1, 1989 to September 14, 1989. Wood had admitted these distributions while contending that they had been made under duress. She cannot fairly be made accountable for them without passing on her claim of duress. The jury verdict as to her act on September 14, 1989 does not speak to her state prior to this date. If her contention is correct, she committed no crime prior to this date. The sentencing court cannot hold her responsible without first deciding whether she was in fact under duress.

■ If the court should conclude that Wood has not carried her burden of proving duress because her evidence of duress is not credible, it is still open to the court to consider whether there was duress that did not amount "to a complete defense." U.S.S.G. § 5K2.12. In making such an assessment, the court is not confined to the classical definition of duress, but should properly consider the individual before the court and her particular vulnerability. In this regard, the testimony of Wood's expert, Margaret Ann Fillmore, is of special interest.

At the trial, Wood buttressed her contention of duress with the testimony of Fillmore, who was found qualified to testify as an expert on the psychology of human behavior. She had had substantial experience in dealing with battered women and testi-fied that Trisha Wood fitted the profile of a battered woman. The substance of her testimony is as follows, incorporating within it the text on which she relied:

Battered woman syndrome is a set of psychological and behavioral reactions exhibited by victims of severe, long-term, domestic physical and emotional abuse. L. Walker, *The Battered Woman Syndrome* (1984). Battered woman syndrome is not a mental disease or defect; rather, battered woman syndrome is a post-traumatic stress disorder. Its psychological effects are often similar to the effects of imprisonment on kidnap victims and prisoners of war. Once battered women believe themselves to be helpless victims of abusive men, they behave like hostages and link themselves to their captors out of fear that it is the only way to survive. Battered women are unable to respond effectively to violence because they are psychologically trapped in the violent relationship.

Repeated beatings diminish the battered woman's motivation to respond and instill in her a negative belief about the effectiveness of her actions. This "learned helplessness" keeps the battered woman from leaving her batterer. One of the primary survival skills of battered women is hyperalertness. The battered woman learns to be sensitive to her environment to prevent further violence to herself. The development of survival skills, however, comes "at the expense of escape skills." L. Walker at 33 & 87–89. Society often misinterprets the survival skills of battered women as signs of passivity and weakness coupled with an unwillingness to leave the violent relationship. *Id.* at 33. A common misunderstanding is that the battered woman's responses are indicative of weak character. Rather, these responses must be seen as attempts to cope with the abusive and controlling environment in which she lives and from which she is helpless to escape.

It is in the first instance the task of the sentencing court to determine the credibility and weight of such testimony and its relevance to the case of the defendant before the court. Battered woman's syndrome is not a gross, identifiable mental

defect. On the other hand, it is well recognized in other areas of law. *See* C.K. Gillespie, *Justifiable Homicide* 157 (1989). The majority of state courts that have considered the issue have admitted expert testimony as to the syndrome on behalf of a woman contending that she acted in self-defense. *See Tourlakis v. Morris* 738 F.Supp. 1128, 1233 (1990) (S.D.Oh.1990) (listing cases). In the first federal appellate case to consider the syndrome, it was at the government's instance that expert testimony on the syndrome was introduced, in order to explain a change in testimony by a key witness; the appellate court ruled that there was no reason to limit such evidence "to cases in which it is offered to bolster a claim of self-defense." *Arcoren v. United States*, 929 F.2d 1235, 1241 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991).

The defense has a particular relation to the defense of duress as it has been expanded by the commentary to the Model Penal Code. The Model Penal Code itself, as has already been remarked, uses a person of ordinary firmness as the measure of duress but its commentary expands the defense to encompass a case where "by the continued use of unlawful force, persons effectively break down the personality of the actor, rendering him [or her] submissive to whatever suggestions they make. They then, using neither force nor threat of force on that occasion suggest that he [or she] perform a criminal act; and the actor does what they suggest." *Id.* § 2.09, comment 3. A leading authority on the common law has added that the defense applies when the defendant is so far "in thrall to some power" that a legal sanction would be ineffective in controlling any choice that may be made. Glanville Williams, *Criminal Law: The General Part*, 755–62 (2nd ed. 1961). The commentary to the *Model Penal Code* repeats Williams' language without disapproval. *Model Penal Code* § 2.09 n. 40. This substantial expansion of the defense may go too far if not linked to gross and identifiable classes of circumstances. Battered women are in circumstances forming such a class.

■ Our own law recognizes that for a substantial period of time a brutal man may subject women to severe psychological stress such that they "failed to escape or cry out for help when in a public place because they lacked sufficient ego strength, self-confidence and willpower when they were in the threatening shadow of [the man's] complete domination over them." *United States v. Winters*, 729 F.2d 602, 605 (9th Cir.1984). It was the government in *Winters* that relied on a psychiatrist's testimony to make this point. In other contexts, too, we have recognized the "pattern, all too familiar, of a victim identifying with the aggressor under conditions of terror." *Lazo–Majano v. INS*, 813 F.2d 1432, 1434 (9th Cir.1987). Accordingly, what is required is for the fact-finder to determine whether, given the experience and psychological makeup of this defendant, she feared to leave her criminal ways and obeyed from fear the criminal who directed her conduct.

■ Woods' case is remanded for resentencing. In resentencing Wood, the judge may consider as "relevant conduct" under section 1B1.3 other acts of distribution. Ordinarily, the government carries the initial burden of establishing the existence of the other relevant conduct. This need is obviated in the present case by Wood's own admissions. Wood is entitled to the affirmative defense of duress for the acts of distribution that are considered relevant conduct for the purposes of sentencing. Offering an affirmative defense, Wood must shoulder the burden of proof with respect to each of the required elements of the defense.

■ The district court is free to give such credibility and weight as it finds appropriate to Fillmore's testimony and, in light of such findings and the other evidence presented, to determine whether Wood acted under duress. At the conclusion of the hearing, the district court is required by Fed.R.Crim.P. 32(c)(3)(d) to make findings as to each controverted matter or to indicate that the court is not taking the matter into consideration.

*United States v. Fernandez–Angulo,* 897 F.2d 1514, 1516 (9th Cir.1990) (en banc). The district court's present findings relating to duress as an affirmative defense are inadequate.

Apart from the complete defense of duress, the district court has the discretion to depart downward under section 5K2.12 of the Sentencing Guidelines on the basis of incomplete duress. On remand, the district court should consider whether the facts of this case support such a departure and should make specific findings as to controverted matters or indicate that the court is not taking them into consideration.

*The Duress Defense in Relation to Johnson.*

■ According to Carol Sue Johnson's testimony, the following was true: Johnson began to work for Longoria's drug ring at the end of January 1989 after he had made an implicit threat to injure one of her children. Given the violence of which she had reason to know Longoria was capable, she could have reasonably believed that the threat to her daughter was one of severe bodily injury. She continued to work for him "to keep from getting a beating;" she had seen "how he did other people." When her husband attempted to get her away from Longoria he was thrashed at Longoria's direction. In March when she tried to talk to the police, they offered no protection. She was subsequently threatened with death by Longoria. In April when her husband tried to bring her home, Longoria and his bodyguards inflicted severe physical injury on Mr. Johnson and threatened him with death. A week later Longoria arranged for Mr. Johnson to see Longoria's men nearly kill a young man and Longoria threatened the same to the whole Johnson family if Mr. Johnson "kept messing with him."

If Johnson's testimony were believed, she met the strictest test for having been under duress. She was threatened with serious bodily injury, had a well-grounded fear that the threat would be carried out and no reasonable opportunity to escape. The last point, however, was open to challenge. The jury, in acquitting Johnson on three counts of distribution, believed her; but, in convicting her of conspiracy, apparently did not accept the view that she was under complete duress for the six months she was involved in drug dealing.

On appeal, Johnson challenges the court's ruling that denied her the opportunity either to cross-examine Fillmore or call Fillmore in her own behalf. Johnson had no right of cross-examination against Fillmore, who did not testify against her. The court denied her the right to call Fillmore as her own witness on several grounds, among them the absence of a foundation for Fillmore's expert testimony. Fillmore had observed Johnson testifying at the trial, but she had had no interviews with her, and when she had testified for Wood she had stated that interviews were essential for her diagnosis. Without any personal contact between Fillmore and Wood, Fillmore's expert testimony would have been a stereotype applied to a case she knew only in the most external way. The court did not abuse its discretion in denying Fillmore's testimony to Johnson.

■ At sentencing, Johnson asked the court to depart downwards because she had at least suffered duress not amounting to a complete defense. The court stated that it took note of Johnson's "unusual life" (a life replete with abuse by her father and her three husbands), and that she had become involved "with an evil man." The court said, "It's not with happiness that I impose sentence upon you." Turning specifically to downward departure, the judge said: "The court concludes that there are no grounds for a downward departure under the law, but the criminal conduct of Ms. Johnson was voluntary and there are no grounds which will justify a downward departure."

In the context of Johnson's case for a downward departure, the court's finding was inadequate. The court appeared to equate "voluntary" with "absence of duress." But even the complete criminal defense of duress assumes that the criminal act is performed voluntarily. A fortiori, the incomplete defense of duress supposes a voluntary crime, carried out by a person

whose personal characteristics and personal perception of the circumstances of the situation made her susceptible to the threat of force. Given the court's apparent acceptance of Johnson's credibility as to her sad and savage treatment by male abusers and given the court's recognition that Johnson had been involved with a manipulative, violent, brutal drug lord, the court did have the discretion to depart downward if the court found that Johnson had been subject to coercion, even though with effort she could have escaped. Accordingly, in Johnson's case we remand for resentencing in terms of such downward departure as the court finds appropriate under section 5K2.12 by reason of the effect of incomplete duress upon Johnson's participation in the conspiracy.

The Duress Defense In Relation to Breck

■ Unlike Carol Sue Johnson, Kristy Ann Breck began to work for Longoria without any overt threat on his part, and she continued to work for him without such threats being made directly. At the same time, according to her testimony, she was psychologically dominated by him. After she took the cocaine back to him in late January he talked her into resuming selling: "He always talked you into everything and he talked me into taking another ounce." She was asked if she told Longoria that she did not want the drugs to distribute. She replied "No, I never said I would not do anything. I was scared to say no to him." She was very conscious that he would punish disloyalty severely and particularly scared that he would find out that her mother had talked to the police. She knew that if he found out, "something would happen to one of us—for punishment I guess you would put it." If she had told Longoria that her mother had talked, "she'd be dead today." When he told her to start making deliveries after his son's arrest she did not want to do it. She was asked at the trial, "Were you given any choice about it?" She replied, "No, you don't have choices when it comes to Danny." She was asked, "When it comes to who?" She replied, "When it comes to Danny, Sr. you don't have a choice."

Breck's own account may be supplemented by the testimony of her former fiance, Ed Lowry, who testified that when he saw her in July 1989 she told him that she "was very frightened" but would not give him the details because "she feared for me, for anybody else in her family." Michelle Benke, Breck's friend since childhood, testified that she believed Longoria "was trying to exercise authority over" Breck and that "she did everything he told her to do." Kelly O'Rourke, who was brought to a Longoria party by Breck, saw one of the bodyguards "strike a girl in the face and throw her out the door." Breck herself heard on numerous occasions from Longoria of his violent treatment of persons who crossed him.

■ The court denied Breck the right to cross-examine Fillmore as a witness or call her in her own behalf. The court also denied Breck an instruction on duress. There was no error in these rulings. Breck had not made out a prima facie case of duress because she had made no showing that she could not far earlier have escaped Longoria, as she in fact finally did. *United States v. Jennell,* 749 F.2d 1302, 1306 (9th Cir.1985), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93. Fillmore's testimony, going to her special subjective vulnerability, would not have established the lack of opportunity to escape that the defense of duress requires.

■ At sentencing, however, Breck sought a downward departure on the grounds of incomplete duress. She presented a report by Fillmore, that may be summarized as follows: Fillmore had interviewed Breck three times for several hours, meeting her both for purposes of treatment and diagnosis. At the conclusion of these meetings Fillmore was of the opinion that she fitted the profile of a battered woman. As a child, Breck had learned she could remain safe from physical harm from her father by remaining submissive and childlike around him. This experience set a pattern of cyclical behavior repeated in her later years. This behavior, learned in early childhood, became habitual, virtually automatic and not con-

scious. She knew that she was safe if she was submissive toward men who seemed aggressive or dangerous.

As a woman, she sought out men who shared characteristics she identified with her father. These characteristics included excessive drinking, a claim they would protect her from harm although she distrusted them, and domineering behavior towards her. She was terrified of these men but most of the time not conscious of the terror. This is a state of mind known as "frozen fright." She was an easy victim of a powerful, manipulative and violent man such as Daniel Longoria, Sr. The crux of the syndrome is that she was attracted to the same men who frightened her. The syndrome explains why she continued to associate with Longoria even as she learned more and more frightening details about his character and conduct and explains why she agreed to marry his son even after Longoria, Jr. had begun to abuse her physically.

Still according to Fillmore, Breck's frozen fright explained her apparent cheerfulness at times during her work for Longoria and her tolerance of violent behavior. She was also typical of battered women in believing that the men who controlled her had extraordinary insight into her thoughts and actions. Such a person does not have the psychological freedom to end her victimization without assistance.

In sentencing Wood, the court had observed: "The behavior of Mr. Longoria was so atrocious that the court does have compassion for a lot of the people who got mixed up with him. But I am constrained a great deal in my sentencing power...." In sentencing Breck the court stated: "As I listened to this case I had and I have a great deal of compassion for most of the people who got involved with this man. I mean how he could have gotten off on a trip that is one of the most diabolical ones that I have heard of in my career on the bench, and I have heard many diabolical plans. So I do have compassion for you, but I am confined by the Congress and the Sentencing Commission." Turning then to the request for a downward departure, the court declined to depart, stating: "Kristy Breck's participation in the criminal conduct was as a result of her involvement with illegal drugs."

There is no doubt of the accuracy of the court's observation that Breck became involved with Longoria through the use of illegal drugs. The court, however, did not address the circumstances in which Breck remained with Longoria and worked for him. The court did not address the report of Fillmore as to Breck's "frozen fright." The court stated that it felt compassion for the defendants but at the same time appeared to be constrained by what it described as the "rigid rules" of the Guidelines. It does not appear from the transcript of the sentencing hearing that the court took into account that it might depart downwards on the grounds of incomplete duress and that in making the determination of incomplete duress it was free to take into account the subjective vulnerability of Breck. For this reason, we remand Breck's case for resentencing.

*The Defense Of Duress And The Acceptance Of Responsibility.*

■ Breck, Johnson and Wood all asked for a reduction on the grounds that they had accepted responsibility. In each case the district court denied the reduction, on the ground that they had not accepted responsibility in a timely fashion.

The Guidelines provide: "(a) If the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct, reduce the offense level by 2 levels. (b) A defendant may be given consideration under this section without regard to whether his conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of conviction at trial." U.S.S.G. § 3E1.1.

The commentary gives examples of the circumstances under which a defendant qualifies for this provision. The circumstances include "voluntary and truthful admission to authorities of involvement in the offense and related conduct" and "timeliness of the defendant's conduct in manifesting the acceptance of responsibility."

The Guidelines make an effort not to penalize a defendant for asserting his constitutional right to a trial, but go dangerously close to imposing such a penalty. Yet it is established that to penalize a defendant for exercising a constitutional right is unconstitutional. *United States v. Watt,* 910 F.2d 587, 591–92 (9th Cir.1990). The commentary adds: "This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. § 3E1.1.

The relation of this part of the Guidelines to the defense of duress is a new question, not hitherto decided by an appellate court. The defense of duress is an affirmative defense which negates criminal conduct by the fact of coercion. Did Breck, Johnson and Wood deny "the essential factual elements of guilt?" At their trial they made what appear to be, so far as the record goes, "voluntary and truthful admissions" of their involvement in the offenses charged. Wood even admitted involvement in offenses with which she was not charged. At the same time if the defendants' testimony had been accepted, they would have been not guilty of the crimes with which they were charged. They would have proved a complete defense—a defense that, although their actions were voluntary, they were not responsible for what they did. Consequently, these defendants are not entitled to a reduction for acceptance of responsibility during the trial.

 The question remains whether they may be entitled to a reduction for acceptance of responsibility after the trial. The district court found their acceptance to be not "timely". In doing so, the district court was in accord with commentary 2 to the Guidelines § 3E1.1. But the commentary if taken in this literal way is in conflict with Guidelines § 3E1.1(b). In the case of conflict the Guidelines themselves prevail over the commentary.

The Guidelines make clear that the reduction for acceptance of responsibility is available *"without regard* to whether [a] conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of trial." U.S.S.G. § 3E1.1 (emphasis added). This statement is at odds with the commentary which suggests that a defendant who goes to trial will be eligible for a reduction only in "rare situations." *Id.* commentary 2.

This court sitting en banc recently addressed the weight to be given to the commentary when interpreting the guidelines. *United States v. Anderson,* 942 F.2d 606 (9th Cir.1991) (en banc). We concluded the commentary is an "aid" to interpreting the guidelines entitled to "considerable weight" but not "on par with the guidelines themselves." *Id.* at 611. We also held that when possible the guideline and commentary should be construed together. *Id.* at 612. But where the commentary and guideline go in different directions and cannot be reconciled, "the text of the guideline must prevail." *Id.*

The text of section 3E1.1 and its commentary pull the sentencing court in opposite directions. The text tells the court to assess the defendant's acceptance of responsibility "without regard" to whether he stood trial or not. That statement is in accordance with the rule that a defendant may not be penalized for exercising a constitutional right. But the commentary seemingly contradicts the text by stating the reduction should rarely be given to a defendant who proceeds to trial. Without attempting to resolve the contradiction, if such it is, we hold that this case is one where going to trial did not preclude acceptance of responsibility.

In this case the practical certainty of a trial was a foregone conclusion. The government refused to consider plea offers from any single defendant unless all of the defendants pleaded guilty. Its refusal was a proper exercise of prosecutorial discretion, but under these circumstances it is inappropriate to deny a reduction for responsibility based solely on the timing of the acceptance; no defendant so far as the

record before us appears, could have pleaded guilty without all co-conspirators' unlikely decision to do the same. We conclude that if in fact the defendants accepted responsibility by statements made after the conviction they are entitled to this reduction. Cf. *United States v. Hill*, 953 F.2d 452, 461 (9th Cir.1991, as amended December 16, 1991).

After the conviction, to be sure, the defendants continued to maintain that at least they had been subjected to incomplete duress. But, unlike a claim of complete duress, a claim of incomplete duress does not deny criminal guilt—it merely ask for leniency because of the coercion to which the defendant had been subjected. There is consequently no barrier to getting one reduction for incomplete duress and another reduction for acceptance of responsibility.

A separate issue is whether acceptance of responsibility requires expression of remorse. The Guidelines indicate that it does. U.S.S.G. § 3E1.1, commentary 2; cf. *United States v. Ramos*, 923 F.2d 1346, 1360 (9th Cir.1991). Implicit in the claim of duress may be regret for having been forced to choose criminal conduct. It would appear that the trial testimony of all three defendants did express regret for what they had done; but the remorse of the defendant must be assessed by the district court. The Guidelines, moreover, note that, despite truthful admission of involvement in the offense and related conduct, there may be other conduct of the defendant inconsistent with the acceptance of responsibility. U.S.S.G. § 3E1.1, commentary 3. Consequently, we remand the cases of Breck, Johnson and Wood for the district court to determine their acceptance of responsibility in the light of all the relevant factors.

The Trial Issues Raised By Emelio.

Emelio collected money for the ring. His principal issue on appeal is that he was entitled to have his trial severed from that of the other defendants. The denial of a motion for severance is reviewed for abuse of discretion. *United States v. Sherlock*, 865 F.2d 1069, 1078 (9th Cir.1989). Defendants must meet a heavy burden to demonstrate such an abuse, and the trial judge's decision will seldom be disturbed. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980). "The party seeking reversal of a decision denying severance under Rule 14 has the burden or proving 'clear,' 'manifest,' or 'undue' prejudice from the joint trial." *Id.* (citations omitted). That burden has not been met in this case.

Emelio was charged along with Breck in one count of distribution. Breck admitted her participation in drug dealing but when asked by the government if she recalled being with Emelio answered, "Not really, No." The jury ultimately acquitted Emelio on that distribution count. The jury's decision to acquit him on that count demonstrates that Emelio was not prejudiced by being tried with Breck.

Emelio objects that the testimony at trial was replete with references to the violence meted out by "the Samoans;" and that he was a Samoan but a non-violent one who actually risked himself to warn witnesses who had been in danger from Longoria. The incidental prejudice to Emelio from the testimony about the Samoans was, however, insufficient to deny him a fair trial or entitle him to be tried separately from his co-conspirators. He was convicted not of violence but of collecting payments for drugs.

Emelio makes the same claim that he should have been allowed to cross-examine Fillmore that is made by Breck, Johnson and Wood, and his claim fails for the same reason.

Johnson and Emelio were stopped for traffic violations by narcotics officers in March 1989. Evidence obtained from these stops was introduced over objections that the stops were pretextual in nature. The trial court held suppression hearings on the validity of the stops. In both instances, the court found the officer credible and the stop to be valid. There was no clear error. *United States v. Baker*, 850 F.2d 1365,

1368 (9th Cir.1988). We also reject Emelio's contention that his suppression hearing was unfair. The court limited Emelio's cross-examination of the stopping officer but did not abuse its discretion in doing so. The same two defendants, Johnson and Emelio, also contend the district court improperly admitted evidence that the government failed to produce as required by Rule 16 of the Federal Rules of Criminal Procedure. That rule, however, gives the court broad discretion in regulating discovery violations. The court properly exercised its discretion in this case.

Emelio's Acceptance Of Responsibility.

 Emelio asked for a reduction on the grounds that he had accepted responsibility. The Probation Office stated that Emelio "has freely admitted his involvement in the instant offense" and recommended a two-level reduction for acceptance of responsibility. The government objected in writing and at the sentencing hearing. The court appeared to accept Emelio's personal statement of remorse, then denied the reduction based on timeliness.

Our previous discussion of "timeliness" in relation to the other defendants applies here. For the reasons already stated, Emelio may be found to have accepted responsibility in a timely fashion after his conviction.

It may be that the court observed conduct on the part of Emelio that was inconsistent with acceptance of responsibility. That conclusion cannot be made from the record before us. There were other factors besides timeliness that the court should have taken into account. The record is clear, for example, that Emelio voluntarily terminated his association with Longoria at least three months before the drug ring was busted. The same commentary that makes timeliness a factor says the court should also consider whether the defendant withdrew from the criminal conduct or association. Consequently, we remand the case of Emelio for the district court to determine his acceptance of responsibility in the light of all the relevant factors.

Baracco's Sentence.

 Angela Baracco was sentenced on the basis of the total amount of drugs distributed by the conspiracy. So sentencing, the court followed the commentary to § 2D1.4 of the Guidelines:

If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, *each conspiracy transaction* shall be included with those of the substantive counts of conviction to determine scale. (Emphasis added).

But that same commentary directs the court to Application Note 1 to section 1B1.3 discussing "Relevant Conduct." That provision places a limit on the conduct undertaken by others for which a defendant may be held accountable. The line that section 1B1.3 draws is one of foreseeability—a defendant may be sentenced on the basis of the criminal activity of others only if that activity "was reasonably foreseeable by the defendant." What is reasonably foreseeable is what is foreseeable by the particular defendant being sentenced:

Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly under-taken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline. *Id.*

 On appeal Baracco argues that as of May 29, 1989 she was in custody and so no longer able to take part in the conspiracy. The law on withdrawal from a conspiracy requires a conspirator to take some action indicating disavowal of the conspiracy. *United States v. Loya*, 807 F.2d 1483, 1493 (9th Cir.1987). As a general rule, the fact that a conspirator is taken into custody does not automatically indicate

disavowal of the conspiracy. Baracco, however, has been found by the court to be a "minor" participant in the conspiracy headed by Longoria. Once in custody, she was in no position to continue her role as a drug distributor. It stretches a legal fiction to the breaking point to hold her accountable for the drugs Longoria distributed after May 20, 1989. Consequently she can be sentenced only on the basis of drugs distributed by the conspiracy before this date.

AFFIRMED as to all of the defendants' convictions; all sentences are VACATED and all cases are REMANDED for resentencing.