UNITED STATES of America

v.

**Maria Liliana GAVIRIA, Defendant.**

**No. CR 89–901.**

United States District Court,
E.D. New York.

Oct. 22, 1992.

Andrew J. Maloney, U.S. Atty., Brooklyn, N.Y. by Edward Mechmann, for the U.S.

Howard Leader, New York City, for defendant.

## AMENDED MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

Defendant pled guilty to knowingly and intentionally possessing cocaine with intent to distribute. 21 U.S.C. § 841(a)(1). Her offense carries a mandatory minimum sentence of five years. 21 U.S.C. § 841(b)(1)(B)(iii). The Sentencing Guidelines call for a sentence of between 70 and 87 months. Because of defendant's subservience to her husband who was himself primarily responsible for her acts, the court departs downward to the statutory minimum.

## I. FACTS

The court held a *Fatico* hearing prior to sentencing. Defendant's testimony, the report of a psychiatrist who interviewed her and the report prepared by Probation established the following facts.

Maria Liliana Gaviria is now 21 years old. She was born in Colombia where she grew up in poverty-stricken neighborhoods of Medellin. She remains a Colombian citizen. Her parents had two other children together. When defendant was four, her father left permanently. He now has a total of eighteen children. Another man, Manual Antonio Henao, moved in after the father left. Defendant's mother had two children by Mr. Henao and also took in three abandoned children. One of defendant's sisters is now in the United States but refuses to see her. The other siblings remain in Colombia.

Mr. Henao beat defendant frequently with cables and pieces of wood. A babysitter also abused her and her siblings. The babysitter stripped the children and left them naked in a closed room. She beat them, especially defendant who resisted more than the others. Defendant's aunt, accusing defendant of having sex with the local butcher, also beat her while the aunt's friends held defendant by the hands and feet.

Life in defendant's home was hand-to-mouth. She left school after the fifth grade. She learned the survival tactics of the street. She would travel to wealthy neighborhoods, beg for clothes and bring them home to the family. The family lived in a rented house and sublet most of the rooms to others. Defendant's husband met her when he came to visit one of the tenants. He was twenty-three and she was fifteen. They married about one year later.

Defendant's husband used drugs, stole and was involved with other women. He refused to give her money for food. He would badly beat her, then attack her sexually. After she became pregnant, the beatings continued. In one incident, he stabbed her in the thigh with a knife. Her daughter was born prematurely. She had a second child, a boy. Defendant remained with her husband, hoping the violence would cease.

In 1987, defendant and her husband left the children in Colombia and crossed illegally into the United States through Mexico. He assured her that he would support the children but never did. They remain in poverty in Colombia, lacking clothes.

The couple flew to New York where he dealt in drugs. He insisted that she assist him in his drug operation.

He continued to beat her. If she bled, he would hit her harder. He once punched her in the head hard enough to render her unconscious for an extended period.

Defendant remained dependent on her husband and his friends. She did not know English, had no money and did not know how to travel. She feared death at the hands of her husband. She complied with his orders.

On December 4, 1989 Drug Enforcement Administration agents executed a search warrant at an apartment in Queens. When they entered, they saw defendant throw a brown bag off the balcony. The agents discovered 22.2 grams of cocaine base in the bag. They found another 45.5 grams of cocaine base in defendant's jacket which they recovered from the bedroom closet.

A psychiatrist concluded that defendant suffers from anxiety and depression and that she "reflects the stigmata of an abused person, lacks any sense of self esteem, is uneducated, dependent and has clearly been on the street and scrounging most of her life.... [She is] a sad and lonely woman with little sense of her worth and with a potential for further victimization."

The Guidelines dictate an offense level of 32 for the 67.7 grams of cocaine base. Guideline § 2D1.1(a)(3). Three points are subtracted for acceptance of responsibility. *Id.* § 3E1.1(a). Since defendant was a minor participant in the overall offense, an additional two points are subtracted. *Id.* § 3B1.2(b). Her total offense level is 27. She has no criminal history. As already

noted, the Guidelines dictate a sentence of between 70 and 87 months in prison.

## II. LAW

One person can cause another to commit a crime using three types of compulsion under circumstances where free will and mens rea are reduced. First, *duress* is sufficient physical compulsion or its psychological equivalent to eliminate mens rea. Second, physical *coercion* or its psychological equivalent can overcome much of a defendant's resistance, but leave enough freedom to support a finding of mens rea. Third is a relationship of *subservience* in which the law assumes that the actor could avoid criminal acts. The third category includes persons, often women, following the commands of another, often a male partner, because of a pattern of physical and psychological domination that develops over time. Each of these three levels requires independent legal analysis for purposes of sentencing.

### A. *Duress*

The defense of duress is narrowly defined. The facts must show "that (a) at the time of [defendant's] conduct he was subjected to actual or threatened force, (b) the force or threat was of such a nature as to induce a well-founded fear of impending death or serious bodily harm, and (c) there was no reasonable opportunity to escape from the force or threat other than by engaging in the otherwise unlawful activity." *United States v. Villegas*, 899 F.2d 1324, 1344 (2d Cir.1990).

█ Only the extraordinary case will meet this demanding test. It does not recognize the effects of subtle, ongoing forms of physical and psychological abuse. The defendant must be presented with an immediate and clear choice between commission of the crime charged or of serious harm to himself or another without reasonable means to escape. *See Villegas*, 899 F.2d at 1344 ("well-founded fear" and "no reasonable opportunity to escape" required for duress defense); *see also* N.Y. Penal Law § 35.10 (use of force justifiable only if

defendant acts on "reasonable belief" in existence of requisite facts).

These standards operate even in cases in which severely battered women kill their abusers. *See, e.g., People v. Emick*, 103 A.D.2d 643, 481 N.Y.S.2d 552, 561 (4th Dep't 1984) (jury had "to determine, from a subjective standpoint, whether defendant reasonably believed that she was in imminent danger"); *State v. Stewart*, 243 Kan. 639, 763 P.2d 572, 579 (1988) (even battered woman's self-defense claim must be measured by objective reasonableness standard); *see also* Holly Maguigan, *Battered Women and Self-Defense: Myths and Misconceptions in Current Reform Proposals*, 140 U.Pa.L.Rev. 379 (1991) (law of self-defense and battered woman's situation); Susan Estrich, *Defending Women*, 88 Mich.L.Rev. 1430 (1990) (book review) (same).

*United States v. Johnson*, 956 F.2d 894 (9th Cir.1992), illustrates the difficult burden defendants confront in arguing duress in cases such as the one before the court. In *Johnson*, several women who were convicted of functioning as low-level operatives in a large drug operation presented claims related to the legal effect of duress on both their convictions and sentences. Each defendant's case presented different facts involving abuse by the operation's male bosses. A woman who had a gun placed in her mouth and had her daughter's life threatened failed to persuade the jury of her defense of duress. *Id.* at 898–99. Another woman and her husband were repeatedly threatened with death and he was forced to watch another man nearly killed; while acquitting her on three distribution counts, the jury convicted her of conspiracy. *Id.* at 900–01. The court found that the third woman had failed to make out a prima facie case of duress because, although she proved she had been "psychologically dominated" by the operation's chief, she failed to prove that she could not have escaped his control. *Id.* at 902.

### B. *Coercion*

In cases involving coercion the abuse of a defendant is not severe enough nor is it

connected directly enough with the defendant's crime to support a duress defense. Viewed in its entirety, however, the abuse significantly lessens the defendant's blameworthiness. The Sentencing Guidelines grant the court the authority to depart downward in these circumstances. As Guideline § 5K2.12 puts it: "If the defendant committed the offense because of serious coercion ... or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range." In *United States v. Johnson*, 956 F.2d 894, 899–903 (9th Cir.1992), the court recognized the operation of the Guidelines in instances of physical coercion and remanded all three defendants' cases for resentencing in light of Guideline § 5K2.12 and the battered woman's syndrome.

## C. *Subservience*

A defendant might not be able to show the sort of "serious coercion ... or duress" of which the Guidelines speak, yet still might establish a pattern of dependence that would be relevant to blameworthiness and her sentence. A woman living in a relationship of complete subservience to a man deserves less punishment than the usual defendant when that man orders her to commit a crime and she obeys. The male's control can result from a combination of physical and psychological abuse, cultural norms, economic dependence and other factors.

The Sentencing Guidelines fail to account for these endemic sociological and psychological realities. Nowhere in the Guidelines' formulaic mechanism is there room to consider how the facts of the life of a woman abused in this fashion should bear upon her sentence.

Congress has mandated that the sentencing judge consider, among other things, "the need for the sentence imposed ... to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2). By failing to account for the situation of the subservient woman, the Guidelines hinder rather than advance these statutory objectives. *See United States v. Rogers*, 972 F.2d 489, 494 (2d Cir.1992) (danger in "tangled wake" of Guidelines that district judge will conclude that role in bringing compassion and common sense to sentencing has been eradicated); *United States v. Concepcion*, 795 F.Supp. 1262, 1279–81 (E.D.N.Y.1992) (sentencing judge should not rigidly obey Guidelines when they fail adequately to implement Congress's statutory directives).

## D. *Relevance of Levels of Compulsion in Sentencing*

The affirmative defense of duress to a criminal charge imposes a stringent objective standard on evaluation of a defendant's conduct. In contrast, when sentencing the guilty, the legal standards are more subjective and less strict. *See* 18 U.S.C. § 3553(a) (court shall consider, *inter alia*, "nature and circumstances of the offense and the history and characteristics of the defendant").

Whether a particular defendant committed her crimes under the influence of a pattern of emotional and physical abuse is relevant to blameworthiness. Incarceration of such a defendant might not serve the statutory objectives of specific or general deterrence, incapacitation, rehabilitation and retribution that normally motivate sentencing decisions.

The prevalence of psychological and physical abuse of women is well-documented. The cycle of victimization and dependence that develops in systematically abused women is now an established psychological phenomenon. *See generally* Lenore E. Walker, *The Battered Woman Syndrome* (1984).

Women reared and living in traditional cultures, in which gender roles are often highly determined and women are more likely than in the United States to be relegated to a subservient status, are particularly susceptible to patterns of dependence, domination and victimization. *See, e.g.,* Isabelle R. Gunning, *Arrogant Perception, World Travelling and Multicultural Feminism*, 23 Colum.Hum.Rts.L.Rev. 189 (1992). Women reared in traditional Latin

American cultures are likely to be subjected to male domination that often includes physical abuse. *See* Evelyn P. Stevens, *Marianismo: The Other Face of Machismo in Latin America, in Female and Male in Latin America* 95 (Ann Pescatello ed. 1973) (traditional ideal of Latin American woman portrays her as submissive to the demands of men); Marjorie Wall Bingham & Susan Hill Gross, *Women in Latin America* 79 (1985) (Spaniards learned from Muslims to hide women and this habit continued in Americas); Eugene Robinson, *Women in Latin America Advance Amid Stereotypes*, Wash.Post, Mar. 29, 1992, at A26 (studies estimate that six in ten Peruvian women have suffered physical or psychological abuse). The level of reported violence against women in Colombia is extremely high. *See Violence Against Women in Colombia*, NotiSur: South American and Caribbean Political Affairs (University of New Mexico, Jan. 8, 1992) (survey results indicate that 65 percent of Colombian women in marriage-type relationships are subjected to emotional and mental abuse, beaten or raped).

The Sentencing Commission has stated that race, sex, national origin, creed, religion and socio-economic status are not relevant to the determination of a sentence. Guideline § 5H1.10 (policy statement). While the Commission has not elaborated on this point, it intended the directive as a blanket prohibition against the operation of racism, sexism or other forms of *bias* in sentencing. Such an admonition to a judge should not be necessary. *See* Code of Judicial Conduct Canon 3B(5) ("A judge shall perform judicial duties without bias or prejudice.").

The Commission's statement on bias must not be interpreted expansively to deny the effects of gender on relevant and appropriate sentencing criteria. Facts about a defendant's life might be highly relevant in sentencing while also correlating to the defendant's gender, race, national origin, beliefs or economic situation. Were the Commission's policy statement read literally, it would have the potential of barring the very evidence Congress has required the sentencing judge to consider.

*See* 18 U.S.C. § 3661 ("no limitation" shall be placed on information about defendant and defendant's conduct which a court may receive in sentencing).

█ A downward departure from the Guideline range is warranted when a woman's status as a victim of systematic physical and emotional abuse substantially lessens her blameworthiness, notwithstanding her legal guilt. Such a departure may be based upon the authority of Guideline § 5K2.12 or independently upon Congress's directives in 18 U.S.C. § 3553 or upon both.

The potential for aggravation in prison of a woman's already serious psychic injuries may independently support a decision to depart downward. The sentencing judge must retain the discretion to tailor the punishment to the person.

## III. MINIMUM SENTENCE

Defendant's crime carries a minimum sentence of five years in prison. *See* 21 U.S.C. § 841(b)(1)(B)(iii). Without a motion from the government waiving the statutory minimum, the court has no authority to order a lesser term. *See* 18 U.S.C. § 3553(e) (on motion of government, court may impose sentence below statutory minimum for defendant's cooperation). The power to depart downward from the Sentencing Guidelines is found in Congress's statutory mandates. That authority is lacking where Congress's own pronouncements speak definitively on the length of a defendant's sentence.

Injustice sometimes results from the rigid operation of the high mandatory minimum sentences contained in the federal drug laws. Until Congress reconsiders its minimum sentence policy—or the United States Attorney exercises a compassionate judgment—the court has no power to consider the injustice of minimum terms in individual cases.

The argument can be made that some minimum sentences are unconstitutional as applied. *See Harmelin v. Michigan*, —— U.S. ——, ——, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836 (1991) (plurality opinion) (eighth amendment forbids sentences

"grossly disproportionate" to the crime); *R. v. Smith*, 1 S.C.R. 1045 (1987) (Canadian law providing minimum seven-year sentence for importation of any amount of any kind of drug—even one marijuana cigarette for personal use—is disproportionate and violates Canadian constitutional provision barring cruel and unusual punishment).

In this case, the application of a minimum sentence is not so shocking and disproportionate as to warrant addressing the constitutional issue. The statute requires a minimum of five grams or more of a mixture containing cocaine base or 500 grams of a cocaine-source mixture before the five-year minimum takes effect. 21 U.S.C. §§ 841(b)(1)(B)(ii), (iii). The statute is quite different from the Canadian provision struck down in *Smith*. Given the great dangers Congress might have seen in the use of cocaine base, or "crack" as it is commonly known, it is not possible to say that a five-year penalty for possessing five grams with intent to distribute is unconscionable. A finding of unconstitutionality as to subservient women might well encourage drug dealers to employ such women to carry out their crimes. *Cf. United States v. Arize*, 792 F.Supp. 920, 921 (E.D.N.Y.1992) (drug smugglers use of pregnant women as couriers in hopes of gaining leniency for them).

## IV. APPLICATION OF LAW TO FACTS

■ Had defendant not pled guilty she probably would not have been able to successfully plead duress. She was not faced with a stark and immediate choice between physical harm and commission of the particular crime for which she was indicted. While it would have been an act of extraordinary courage and perhaps recklessness, she could have left her husband. She knew she was committing a crime by participating in drug dealing and she chose to exercise whatever free will she had to act criminally.

Nevertheless, a full appreciation of defendant's relevant mental state must include the effect of her circumstances on the decisions she made. Until her arrest, defendant's life had been an extraordinary trial of physical and emotional abuse and coercion. Her actions were legally "voluntary," but they were not the result of free rational decisionmaking. Her life is a classic example of the plight of a subservient, abused woman.

As explained by her psychiatrist's report and established by defendant at the sentencing hearing, she has long suffered from anxiety and depression, lacked any self-esteem, blamed herself for her suffering and greatly feared her husband and his associates. At the time she committed this crime, defendant was acting under the influence of all these conditions.

Defendant continues to suffer the severe effects of her history of abuse. Incarceration for an extended period would hamper defendant's chances of recovery from her psychic injuries and possibly make them worse.

## V. CONCLUSION

A downward departure is ordered. Defendant is sentenced to the statutory minimum of 60 months imprisonment, to be followed by five years of supervised release. The court recommends that defendant be deported upon her release from prison.

SO ORDERED.