**UNITED STATES of America,**

**v.**

**Jobim ROSE, Defendant.**

**No. CR 94–243 (JBW).**

United States District Court,
E.D. New York.

May 17, 1995.

Zachary W. Carter, U.S. Atty., by James Castro–Blanco, Brooklyn, NY, for U.S.

Frank Handelman, New York City, for defendant.

**Amended Memorandum and Order**

WEINSTEIN, Senior District Judge.

## I. INTRODUCTION

The defendant has assumed the role of surrogate father to four young second cousins, who are being raised by his maternal grandmother. His relationship with these children is a proper basis for departure under U.S.S.G. § 5H1.6 ("family ties and responsibilities"). That the children are neither his biological nor legal offspring does not change this result.

## II. FACTS

The defendant, a 27–year–old African–American, pled guilty to interstate receipt of a firearm. 18 U.S.C. § 922(a)(3). He had no prior criminal record.

Raised by his maternal grandmother, the defendant had only sporadic contact with his parents during his formative years. Now the grandmother, 69 and retired, with no pension or Social Security, is raising four of the defendant's second cousins. The children's mother is an addict who is unable to care for them; their fathers have deserted.

To assist his grandmother, the defendant has taken a second job while satisfactorily attending college. Although he lives elsewhere, the defendant contributes to his grandmother's household budget. He also assists her by guiding and serving as a role model for the four children.

## III. LAW

### A. Extraordinary family circumstances

■ Guidelines departures based on extraordinary family circumstances are permitted. *See, e.g., United States v. Johnson,* 964 F.2d 124, 129 (2d Cir.1992); *United States v. Alba,* 933 F.2d 1117, 1122 (2d Cir.1991); *United States v. Sharpsteen,* 913 F.2d 59, 63 (2d Cir.1990); *United States v. Ekwunoh,* 888 F.Supp. 369 (E.D.N.Y.1994); *United States v. Gerard,* 782 F.Supp. 913, 914–15 (S.D.N.Y.1991); *United States v. Handy,* 752 F.Supp. 561, 563–65 (E.D.N.Y.1990). As the *Johnson* court noted, "the departure [is] not on behalf of the defendant ... but on behalf of [the] family." 964 F.2d at 129. *See also* Eleanor Bush, *Considering the Defendant's Children at Sentencing,* 2 Fed.Sent.Rep. 194 (1989) (describing desire not to harm innocent parties as "implicit" but universal sentencing consideration).

■ The "family circumstances" caselaw of this and other circuits recognizes that "courts should ... attempt to build procedures, dispositions, and structures that foster extended-family and community responsibility." Gary B. Melton, *Children, Families, and the Courts in the Twenty–First Century,* 66 S.Cal.L.Rev.1993, 2004 (1993). Given this rationale, no one type of relationship is required to trigger the departure power. *See, e.g., Alba,* 933 F.2d at 1122 (recognizing effects of incarceration on defendant's children, parent, and grandparent); *cf. United States v. Sclamo,* 997 F.2d 970, 972 (1st Cir.1993) (approving family circumstances departure based on defendant's "special and crucially important relationship" with the son of the woman he lived with).

That most "family circumstances" departures involve small children reflects the reality that children at crucial stages of development wither without adult nurture. *See, e.g., United States v. Naugle,* 879 F.Supp. 262, 267 (E.D.N.Y.1995). Whether the defendant is a parent in the biological or legal sense, or has become essential to the child's development in some other manner, cannot be decisive. To hold otherwise would be to penalize children for circumstances not of their own making.

As the Supreme Court has noted in striking down statutes that discriminate against illegitimate children, accidents of birth may not be transformed into disadvantage through operation of law. *See Mills v. Habluetzel,* 456 U.S. 91, 97, 102 S.Ct. 1549, 1553, 71 L.Ed.2d 770 (1982); *Gomez v. Perez,* 409 U.S. 535, 538, 93 S.Ct. 872, 874, 35 L.Ed.2d 56 (1973). The guiding principle of a century of civil rights jurisprudence is that no one should be penalized for the circumstances of his or her birth.

## B. Disparate family forms

To hold that legal or biological filial relationships are required for family circumstances departures would ignore the reality of much of modern family life, in which married couples raising their biological children are a minority. *See, e.g.,* United States Department of Commerce, *Current Population Reports: Household and Family Characteristics: March 1993,* at v (1994) (married couples with children accounted for 36 percent of families in 1993, down from 50 percent in 1970); *id.* at x (noting that "[t]he structure of family households has grown complex and diverse in recent decades."); Elizabeth Shogren, *Traditional Family Nearly the Exception, Census Finds,* L.A. Times, Aug. 30, 1994, at A1 (discussing census data); Diane Crispell, *'Traditional' Families Have Thin Tradition,* Wall St. J., May 12, 1993, at B1 (same). *Cf. Anderson v. Edwards,* —— U.S. ——, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995) (upholding California statute defining all children living in the same household under the care of a relative as a family).

Limiting § 5H1.6 departures to "traditional" families might make them unavailable to those who need them most. "[Recent] data, along with the demographics of poverty, support the conclusion that, in New York City, those that are most economically disadvantaged—African–Americans and Latinos—frequently turn to their extended family networks for support." Report of the Mayor's Commission for the Foster Care of Children, *Family Assets: Kinship Foster Care in New York City* 38 (1993). *See also* Margaret L. Usdansky, *'Blended,' 'Extended' Now All in the Family,* USA Today, Aug. 30, 1994 ("Just over 55% of white kids live in [nuclear] families, compared with about 26% of black kids and about 35% of Hispanic kids."); Bureau of the Census, U.S. Dep't of Commerce, *Characteristics of the Black Population* tbl. 7 at 36 (1994) ("Living Arrangements of Black Persons Under 18 Years by Relationship to Householder and Marital Status of Parents").

Restricting the departure to nuclear families, linked by biology or law, would also raise the specter of invidious discrimination against those whose families do not fit traditional patterns. *See, e.g., Mills, supra* (discrimination against illegitimate children violates equal protection); *c.f.* N.Y.Exec.Law. § 296(1) (forbidding discrimination on the basis of marital status). Such a restriction would ignore the courts' obligation to respect diversity—an obligation central to the judicial role in a multi-cultural society and district.

## C. Extended families

In this case, the defendant is part of an extended family network. The Task Force on the Black Family, working under the auspices of the Manhattan Borough President, has described such networks as "kinship and friendship groups committed to mutual sustenance and values of nurturance and social responsibility." Task Force on the Black Family, *Report on the Focus Group on Extended Care Networks* 2–3 (Peggy C. Davis, reporter) (forthcoming 1995, on file with the court) [hereinafter *Task Force Report* ]. The chief role of such networks is to ensure that relatives or friends take care of children whose legal or biological parents are unavailable, or who need caregiving assistance. *Id.* Such networks are common to—although by no means unique to—the African–American community.

As Professors Elmer Martin and Joanne Martin observed in *The Black Extended Family:*

> When we speak of a black extended family, we mean a multigenerational, interdependent kinship system which is welded together by a sense of obligation to relatives; is organized around a "family base" household; is generally guided by a "dominant family figure"; extends across geographical boundaries to connect family units to an extended family network; and has a built-in mutual aid system for the welfare of the family as a whole.

Elmer P. Martin & Joanne Mitchell Martin, *The Black Extended Family* 1 (1978).

The importance of the family network to the African–American community may date back hundreds of years.

Some trace African–American traditions of extended care to West African culture,

while others see those traditions as adaptations to the dangers and dislocations of bondage. Whatever their origin, these networks of mutual obligation have sustained and enriched African–American culture since the seventeenth century.

*Task Force Report, supra,* at 2–3. This history, as well as the ongoing significance of the extended family, has been well documented. *See, e.g., The Extended Family in Black Societies* (Demitri B. Shimkin, Edith M. Shimkin & Dennis A. Frate eds. 1978); Martin & Martin, *supra;* Herbert G. Gutman, *The Black Family in Slavery and Freedom* (1976); Joyce Aschenbrenner, *Lifelines: Black Families in Chicago* (1975); Carol Stack, *All Our Kin: Strategies for Survival in a Black Community* (1974); Robert Hill, *The Strengths of Black Families* (1972); Andrew Billingsley, *Black Families in White America* (1968); Robert Hill, *Informal Adoption Among Black Families* (National Urban League Research Department, 1977); Peggy C. Davis, *When Grown–Ups Want Answers,* 1 Reconstruction 10, 16 (1990) (reviewing Leon Dash, *When Children Want Children* ) (1990) (describing history and operation of kinship networks among black Americans); Wade W. Nobles, *Toward an Empirical and Theoretical Framework for Defining Black Families,* 40 J. Marriage & Fam. 679 (1978); Joyce Aschenbrenner, *Extended Families Among Black Americans,* 4 J. Comp. Stud. 257 (1968); *see also* Lenwood G. Davis, *The Black Family in the United States: A Revised, Updated, Selectively Annotated Bibliography* (1986).

Despite these accounts, and others like them, the extended family is sometimes overlooked by the judicial system. As one participant in the Task Force study noted:

> After we've been here for all these years ... [we are still] trying to prove that there is a black family, we are trying to prove that it has strengths, we're trying to prove that it is extended.... [The extended family] is probably more real than you will ever be able to document.

*Task Force Report, supra,* at 6 (quoting interview with William Perkins, Jan. 10, 1995).

### D. Obligation to recognize the extended family

Under increasing financial and social pressures, the kinship network has grown in importance. *See* Manhattan Borough President's Task Force on the Black Family, *New York City's Black Family: A Preliminary Profile of a Vibrant Community* 4 (1994) (from 1970 to 1980, "[t]he number of Black female householders with children other than their own nearly doubled.... The increase was largely the result of [grandparenting] and foster care arrangements").

The existence of extended family networks poses important challenges for all branches of government. *See* Carol B. Stack, *Cultural Perspectives on Child Welfare,* 12 N.Y.U. Rev. L. & Soc. Change 539 (1983). According to Professor Stack:

> That children in black communities become deeply attached to non-parent kin caretakers is well understood and articulated by community members.... [However, t]hese patterns are complex and sometimes baffling to ... teachers, social workers, *lawyers, judges,* and physicians ... who have tremendous power and discretion in implementing policy.

*Id.* at 545 (emphasis added, footnotes omitted). Professor Stack warns officials against basing policy decisions on preconceived notions of what a family should look like. *Id.* Referring to those agencies charged with implementing social policy, she observes:

> [I]t is safe to say that current practice more often than not fails to respect the integrity of the bonds of psychological parenthood that form between children and non-parent kin.

*Id.* at 539. *See also Task Force Report, supra,* at 2–3; Report of the Mayor's Commission for the Foster Care of Children, *Family Assets: Kinship Foster Care in New York City* 29 (1993) ("It is widely recognized that, in order to accurately plan and deliver meaningful and effective services, providers must recognize the cultural variations and the economic conditions of the groups they are mandated to serve.").

If courts are to fulfill their role of protecting all segments of society effectively, they must take account of differences in cultures and changes in social patterns. *See* Bush, *supra* (urging sentencing courts to "define 'family' expansively," particularly "when looking at families from diverse classes, races or cultures"); Zanita E. Fenton, *In a World Not Their Own: The Adoption of Black Children,* 10 Harv. Blackletter J. 39, 39 (1993) (urging recognition of the fact that "[t]here are many problems specific to Black children arising from the social history of this country"); Placido G. Gomez, *The Dilemma of Difference: Race as a Sentencing Factor,* 24 Golden Gate U.L. Rev. 357, 384 (1994) ("Sentencing judges should … use their unique position within the criminal justice system [to] gather[ ] and consider[ ] all information germane to just and fair punishment."). It is well understood that like treatment for differently-situated individuals can perpetuate disadvantage. This is as true in sentencing as in other contexts.

■ While race itself cannot be considered so as to denigrate an individual or a class, "[f]acts about a defendant's life [may] be highly relevant in sentencing while also correlating to the defendant's gender, race, national origin, beliefs or economic situation." *United States v. Gaviria,* 804 F.Supp. 476, 480 (E.D.N.Y.1992). The policy statement prohibiting consideration of race, U.S.S.G. § 5H1.10, must be read as a prohibition against bias. *See also* Code of Judicial Conduct Canon 3(B)(5) ("A judge shall perform judicial duties without bias or prejudice."). It ensures that criminal sanctions will be tied to individual culpability and characteristics, rather than to group membership. It cannot be taken as an instruction to ignore facts essential to fashioning the individualized punishment required by Congress, or to avoid recognizing circumstances that, properly understood, would lead to downward departures. *See* 18 U.S.C. § 3551 *et seq.; United States v. Concepcion,* 795 F.Supp. 1262 (E.D.N.Y.1992), *criticized on other grounds, United States v. Deriggi,* 45 F.3d 713 (2d Cir.1995); Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing,* 3 Fed.Sent.Rep. 326 (1991).

Recognition of extended family obligations is not limited to any racial or ethnic group

## IV.  APPLICATION OF LAW TO FACTS

■ The court has the power to depart under U.S.S.G. § 5H1.6. While the defendant's crime was serious, a downward departure of four steps is required, in light of the facts and circumstances of the case. *Cf. United States v. Naugle,* 879 F.Supp. 262 (E.D.N.Y.1995) (describing two-step process, in which the court first determines whether it has the power to depart, then decides whether to exercise that power).

Putting the defendant in prison would have grave and irreversible consequences for the extended family. An alternate form of punishment is appropriate in this case. The defendant is sentenced to three years of strictly supervised probation and a $50 assessment.

SO ORDERED.