**UNITED STATES of America, Plaintiff,**

v.

**Michelle T. MARENGHI, Defendant.**

**Crim. No. 94–68–P–C.**

United States District Court,
D. Maine.

June 26, 1995.

---

Helene Kazanjian, Asst. U.S. Atty., Portland, ME, for Government.

Daniel J. Perry, Warren M. Silver, P.A., Bangor, ME, for defendant.

GENE CARTER, Chief Judge.

*MEMORANDUM AND ORDER DENYING ON AN* IN LIMINE *BASIS GOVERNMENT'S MOTION IN LIMINE OR FOR DISCOVERY*

Defendant Michelle T. Marenghi faces charges for conspiring to possess and distribute a controlled substance containing cocaine base and for the underlying substantive offense in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). Now before the Court is the Government's Motion *In Limine* to Exclude Expert Witnesses and in the Alternative for Discovery (Docket No. 23). The Government argues here that Defendant has indicated her intent to present expert testimony regarding her mental capacity and the role of "battered woman syndrome" in the alleged commission of the above charges. The Government asks this Court to exclude such expert testimony as irrelevant to any issue or defense or, in the alternative, to require Defendant to produce the results of certain physical or mental examinations and tests pursuant to Criminal Rule 16(b)(1)(B) and to submit to a psychological examination pursuant to Rule 12.2(c).

## I. BACKGROUND

Defendant provided to the Government, and filed with the Court, a notice pursuant to Criminal Rule 12.2(b) indicating that she will present, through expert testimony, evidence relating to "a mental disease and/or defect and/or other mental condition of hers that bears upon the issue of guilt." Specifically, Defendant states that she will elicit testimony from the following expert witnesses:

1. Mark Vanelli, M.D., is expected to testify regarding Ms. Marenghi's psychological characteristics, social situation, and abusive relationship. Dr. Vanelli will testify how these elements prevented the Defendant from possessing sufficient capacity to commit the crimes charged. He will also testify that the Defendant lacks the ability to enter into the conspiracy as alleged, did not commit any of the acts charged voluntarily and that her actions were the product of coercion.

2. Mary Campbell is expected to testify that the Defendant was a victim of battered women syndrome that prohibited her from forming the requisite capacity to commit the crimes as charged, prohibiting the Defendant from entering into the conspiracy as alleged, and prohibited the Defendant from acting voluntarily in relation to all the actions charged in the indictment. Ms. Campbell also will testify that the Defendant's actions were the product of coercion.

Defendant's List of Expert Witnesses. It is anticipated by the Government that Defendant will argue at trial that she was physically, mentally, and emotionally abused by her boyfriend, Freddie "Pit Bull" Long, who was arrested with Defendant and with whom it is

alleged that she conspired to possess and to sell crack cocaine.[1]

The Government argues that the above expert testimony is inadmissible on two bases: (1) under the Insanity Defense Reform Act ("IDRA"), codified at 18 U.S.C. § 17, evidence of a mental disease or defect is admissible only to demonstrate the elements of the insanity defense; and (2) expert testimony on "battered woman syndrome" is not relevant to establishing the defense of duress.

## II. DISCUSSION

### A. Expert Testimony on Defendant's Mental Capacity

■ The Government argues that, as a result of the IDRA's enactment in 1984, expert testimony on a defendant's mental disease or defect is not admissible to establish a defense other than insanity and that, unless she intends to assert an insanity defense, Defendant cannot offer such expert testimony. The IDRA establishes a specific standard for the defense of insanity and then provides, "Mental disease or defect does not otherwise constitute a defense." 18 U.S.C. § 17(a). This language is interpreted by the Government to preclude the use of any evidence of mental disease or defect as part of a defense case, including negating the presence of *mens rea.* Defendant responds that the IDRA abolishes only true affirmative defenses based on a mental disease or defect but permits a defendant to present evidence to negate *mens rea.*

The Government claims that there is support for its position in the case law of the IDRA in the Court of Appeals for the First Circuit. The first case in this circuit, and apparently in any federal appellate court, interpreting the IDRA is *United States v. White,* 766 F.2d 22 (1st Cir.1985). The defendant in *White* was convicted of conspiracy to possess cocaine with intent to distribute and possession of cocaine. *Id.* at 24. At trial, she attempted to introduce psychiatric testimony, purportedly to "establish[ ] lack of specific intent." *Id.* Specifically, she sought to demonstrate that she "knowingly chose to break the law ... [but that] her motive for knowingly breaking the law was to help her mother." *Id.* (brackets in original). The Court of Appeals panel upheld the exclusion of evidence. First, it stated that such "good motive" evidence is irrelevant in a "diminished capacity" defense "if the defendant is in fact cognizant that the law is being violated." *Id.* More important in *White,* however, was the panel's observation that the exclusion of expert testimony in a "diminished capacity" defense had been upheld by the Court of Appeals earlier that year in *United States v. Kepreos,* 759 F.2d 961 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985),[2] and that such a rejection was in line with Congress's decision to abolish the defense through the enactment of the Comprehensive Crime Control Act of 1984, of which the IDRA was a part. *Id.* at 24-25. This *dictum* has been interpreted by the Government and other jurisdictions[3] as an indica-

---

**1.** Freddie Long is not, to this Court's knowledge, currently facing charges stemming from the December 9, 1994, arrest.

**2.** The Court of Appeals' decision in *United States v. Kepreos,* 759 F.2d 961 (1st Cir.), *cert. denied,* 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985), affirmed, under an abuse of discretion, standard the district court's ruling under Evidence Rule 403 to exclude the proffered expert testimony. The trial in that case was held prior to the enactment of the IDRA and, therefore, the Court of Appeals did not apply the IDRA to the facts there. The basis on which the defendant sought to introduce the evidence is unclear. The panel stated that, according to the defendant, the evidence was offered

> not to show diminished capacity or lack of capacity to form specific intent, but to present

an expert basis for his lack of awareness as to the existence of schemes to defraud....

. . . .

.... In other words, he did not question his capacity to form intent but nonetheless was interested in having the jury receive psychiatric evidence on such issue.

*Id.* at 964. The panel concluded that such evidence would be "both misleading and of questionable utility." *Id.*

**3.** The Court of Appeals for the Eleventh Circuit interpreted the *Kepreos* and *White* decisions as ones in which the First Circuit "upheld the exclusion of 'non-insanity' psychiatric evidence in cases in which district courts did not abuse their discretion in finding that the potential prejudice and confusion fostered by such evidence outweighed its probity." *United States v. Cameron,* 907 F.2d 1051, 1064 (11th Cir.1990).

tion by the court of appeals that it interprets the IDRA to preclude the admission of any psychiatric evidence, including evidence to negate *mens rea,* by a defendant except to demonstrate insanity.

Such an interpretation of the IDRA, however, would establish the Court of Appeals for the First Circuit as the lone appellate voice for the view that the reach of the IDRA operates to preclude the use of expert psychiatric testimony to negate *mens rea.* During the decade since the IDRA's enactment, other federal trial and appellate courts have discussed the IDRA at great length, including highly detailed reviews of its legislative history, and have unanimously concluded that section 17(a) does not preclude a defendant from using expert testimony to rebut the prosecution's attempt to demonstrate the presence of *mens rea* during the charged criminal act. *See United States v. Cameron,* 907 F.2d 1051 (11th Cir.1990); *United States v. Fazzini,* 871 F.2d 635 (7th Cir.), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989); *United States v. Bartlett,* 856 F.2d 1071 (8th Cir.1988); *United States v. Twine,* 853 F.2d 676 (9th Cir.1988); *United States v. Pohlot,* 827 F.2d 889 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988); *United States v. Gold,* 661 F.Supp. 1127 (D.D.C. 1987); *United States v. Frisbee,* 623 F.Supp. 1217 (N.D.Cal.1985). The consensus of the decisions of these federal courts is that the presentation of evidence to negate the presence of *mens rea* does not constitute a "defense" since it merely negates an element of the offense. *See, e.g., Pohlot,* 827 F.2d at 897 ("Because admitting psychiatric evidence to negate mens [sic] does not constitute a defense but only negates an element of the offense, § 17(a) [of the IDRA] by its terms does not bar it."). The courts' analyses of the legislative history of the IDRA led them to conclude

> that Congress meant to preclude only the use of 'non-insanity' psychiatric evidence that points toward 'exoneration or mitigation of an offense because of a defendant's

supposed psychiatric compulsion or inability or failure to engage in normal reflection.'

*Cameron,* 907 F.2d at 1066 (quoting *Pohlot,* 827 F.2d at 890), and that Congress "distinguished such evidence from 'psychiatric evidence to negate specific intent.' " *Id.* These courts also noted that the entire field of law regarding the validity of the so-called "diminished capacity" defense is muddied by the confusion resulting from courts' use of the term "diminished capacity" to describe several distinct defenses or defense theories. *See, e.g., Cameron,* 907 F.2d at 1062–63; *Pohlot,* 827 F.2d at 903–04; *Frisbee,* 623 F.Supp. at 1221.

The First Circuit has not, as of this time, provided any clear indication of whether it would join in the interpretation of the IDRA followed by the above courts if squarely confronted with the issue. The Court of Appeals decisions cited by the Government for authority in this case do not provide a clear answer on this issue since none of those cases required the court to determine the admissibility of evidence properly characterized as negating *mens rea.*

In *White* the panel concluded that the excluded evidence would demonstrate only a "good motive" for the defendant's criminal acts rather than an absence of *mens rea.* The Court of Appeals was not required to reach the issue in *United States v. Lopez–Pena,* 912 F.2d 1536 (1st Cir.1989), *vacated and remanded on other grounds,* 912 F.2d 1552 (1st Cir.1990) (en banc), since the proffered evidence would have shown that the defendant did not have the intelligence to plan the conspiracy but nonetheless retained the capacity to participate in it. *Id.* at 1542. The panel there observed that, on another record, it may have been required to reconsider the courts' remarks in *White* in light of more recent opinions from other circuits, such as *Twine* and *Pohlot.*

In addition, the Court of Appeals, in an unpublished opinion,[4] affirmed a decision of

---

4. The Court acknowledges that it may not cite an unpublished opinion under this Circuit's general rule prohibiting the citation of such decisions. *Bachelder v. Communications Satellite Corp.,* 837

F.2d 519, 523 n. 5 (1st Cir.1988). Nonetheless, the Court has considered the fact that, in the context of the appeal in *Saban–Gutierrez,* the Court of Appeals took no action that could be

the United States District Court for the District of Puerto Rico which granted a new trial after post-trial evidence was discovered that the defendant was mentally retarded and, consequently, may not have possessed the requisite *mens rea. United States v. Saban–Gutierrez*, 961 F.2d 1565 (1st Cir. 1992) (affirming *United States v. Saban–Gutierrez*, 783 F.Supp. 1538 (D.P.R.1991)). *See also United States v. Burns*, 15 F.3d 211, 211 n. 4 (1st Cir.1994) (reserving decision on the admissibility under the IDRA of evidence negating *mens rea* ); *cf. Hernandez–Hernandez v. United States*, 904 F.2d 758, 761 (1st Cir.1990) (rejecting the defendant's allegation that he had ineffective assistance of counsel because, *inter alia*, his attorney declined to pursue "a defense based on a mental defect negating intent" and instead recommended that the defendant plead guilty; the slim possibility of mounting such a defense "in this circuit and on this record" would not have altered the defendant's decision to plead guilty.).

■ This Court concludes, as did the trial court in *Saban–Gutierrez*, that the IDRA does not preclude the admissibility of psychiatric evidence to directly negate *mens rea* and, additionally, predicts that, if the issue were squarely before the Court of Appeals for this circuit, the court would probably join the consensus of all of the other courts which have reached the issue and admitted such evidence. *Saban–Gutierrez*, 783 F.Supp. at 1545 n. 7. The analyses of legislative history of the IDRA and the case law prior to its enactment provided in the other courts' decisions does, in this Court's view, make the IDRA's drafters' intent quite clear and are very persuasive.

Turning to the matter directly before this Court regarding whether Defendant's proposed expert testimony should be excluded, this Court must review the precise scope of the proposed evidence before making a definitive ruling. As discussed above, since Defendant is not asserting a defense of insanity, such evidence cannot be permitted to establish any other sort of defense based on a mental disease or defect. The evidence is admissible, however, for the purpose of directly negating any evidence presented by the Government to the effect that Defendant knowingly and intentionally performed the criminal actions alleged in the Indictment. 21 U.S.C. § 841(a).[5]

The only indication this Court has regarding the scope of the experts' testimony is the brief summary contained in Defendant's Rule 12.2 notice, quoted above. By using language such as "preventing Defendant from possessing sufficient capacity to commit the crimes alleged," Defendant appears to indicate in a general sense that the experts will present testimony negating *mens rea.* Prior to permitting the presentation of such testimony to the jury, however, this Court must consider a proffer of such evidence outside the jurors' hearing.

■ While Defendant characterizes the proposed testimony as evidence offered to negate intent, this Court must ensure that the expert testimony is offered to address substantively the presence or absence of *mens rea.* The courts that have addressed this issue acknowledge that, while evidence negating *mens rea* is properly admitted, it is also quite rare. To be admissible, such evidence must directly negate intent. Most often, courts have noted, evidence purporting to prove that a defendant lacked the "capacity" to form the requisite intent, in actuality merely suggests that a defendant did not have the ability to properly reflect on her or his behavior.[6] In fact, it has been suggested

construed as inconsistent with the Court's conclusions here.

5. Such evidence is admissible only to negate intent in a trial on charges in which "specific intent" is an element of the Government's burden of proof, such as the crimes with which Defendant is charged here. *Cameron*, 907 F.2d at 1063.

6. The Government points out that Defendant's Rule 12.2 notice states that the two expert witnesses would testify that Defendant lacks the capacity to form the *mens rea* requirement for these crimes. The Government interprets *Cameron* to exclude any evidence regarding a defendant's *capacity* to form intent. This Court, however, interprets the pertinent passage from *Cameron* differently. The panel in *Cameron* stated that, most often, evidence purporting to demonstrate an inability to form intent instead illustrates a defendant's "incapacity to reflect or control the behaviors that produced the criminal

that a complete lack of an ability to form intent is so rare that even most legally "insane" defendants could not demonstrate such an impairment. *Cameron,* 907 F.2d at 1066; *Pohlot,* 827 F.2d at 900, 905–06. Nonetheless, courts have admitted evidence under these requirements [7] and this Court may do the same provided that Defendant demonstrates specifically that her evidence will be relevant on the issue of *mens rea* and will not mislead or otherwise confuse the jury on matters of her mental capacity.[8]

Accordingly, the Court orders defendant to provide the Court with a detailed written proffer of the testimony of the experts designated in her Rule 12.2 notice at least ten (10) days in advance of trial.[9] If such proffer demonstrates that the testimony will directly negate *mens rea,* the Court is inclined to

admit such testimony, provided that it is otherwise admissible. This motion is denied with prejudice only to the extent that the Government may not reassert its objection to the proffered evidence for reasons discussed in this decision (*i.e.,* that the evidence is inadmissible due to the IDRA), but it may object to such evidence on other grounds at trial.

## B. Duress and Battered Woman Syndrome

■ Defendant's Rule 12.2 notice also indicates that she intends to provide evidence that she committed the crimes charged as a result of coercion and seeks to provide expert testimony on "battered woman syndrome" to assist the jury in reviewing the evidence.[10]

conduct." *Cameron,* 907 F.2d at 1066. The *Pohlot* court, however, appears to conclude that an inability to form intent is nearly impossible and, therefore, evidence of such an incapacity "distracts and confuses the jury from focusing on the actual presence or absence of mens rea." *Pohlot,* 827 F.2d at 903–04.

The Court is not inclined to consider the language provided in Defendant's Rule 12.2 notice as the definitive representation of what the proposed evidence would show. The wording of the notice discusses a lack of capacity to form the intent associated with these crimes and does not assert that Defendant lacked the capacity to form any intent whatsoever. It is likely, therefore, that the awkward wording of the notice indicates that the expert testimony will demonstrate an absence of *mens rea* for the crimes alleged. After review of the proffer required by this decision, the Court can determine whether Defendant can show that she truly lacked the requisite *mens rea* without confusing or misleading the jury.

7. *See, e.g., United States v. Frisbee,* 623 F.Supp. 1217, 1219 (N.D.Cal.1985) (denying the Government's motion *in limine* which sought to exclude expert testimony establishing that "due to some combination of pathological intoxication, organic brain damage, and an alcoholic blackout or seizure, [the defendant] did not possess the requisite specific intent during the relevant time period to have committed first degree murder"); *United States v. Staggs,* 553 F.2d 1073, 1076 (7th Cir.1977) (reversing exclusion of expert testimony indicating that the defendant suffered from a mental condition that would make it highly unlikely that he possessed the requisite intent for the crime).

8. The Court makes no ruling here regarding the admissibility and scope of the proffered expert testimony under the Federal Rules of Evidence, specifically, Rule 704(b), which states that

[n]o expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto.

Fed.R.Evid. 704(b).

9. The district court in *Frisbee* ruled on the Government's motion *in limine* after reviewing an offer of proof submitted by the defendant there. *Frisbee,* 623 F.Supp. at 1219. Although it is unclear what documents were before the court on the motion *in limine* in *United States v. Gold,* 661 F.Supp. 1127 (D.D.C.1987), the court referred to at least one psychiatric report in its decision. Therefore, in each decision, the trial court had reviewed something more than a statement, such as the one in Defendant's Rule 12.2 notice here, when determining whether the Government's motions *in limine* should be granted.

10. By making this statement in the context of a Rule 12.2 notice, Defendant suggests that battered woman syndrome is a "mental disease or defect." There is no consensus among courts regarding whether the syndrome is properly characterized as a mental defect. *Compare United States v. Johnson,* 956 F.2d 894, 899 (9th Cir.1992) ("Battered woman syndrome is not a mental disease or defect; rather, battered woman syndrome is a post-traumatic stress disorder.") *and United States v. Bell,* 855 F.Supp. 239, 240 (N.D.Ill.1994) (stating that battered woman syndrome is a defense unrelated to a defendant's mental capacity) *with United States v. Willis,* 38 F.3d 170, 175 (5th Cir.1994) (referring to battered woman syndrome as a "psychological condition"), *cert. denied,* —— U.S. ——, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995). The Court, however, need not determine on this motion the

The Government argues in this motion that Defendant has indicated her intent to assert a defense of "duress" or coercion and that such expert testimony would merely demonstrate Defendant's special vulnerability to coercion and, therefore, would be irrelevant to the issue of whether Defendant acted as a "reasonable person" in complying with the purported coercion.

■ Duress is an affirmative defense which is recognized in federal courts and which has developed through the common law. *United States v. Bailey,* 444 U.S. 394, 409–410, 100 S.Ct. 624, 634–635, 62 L.Ed.2d 575 (1980). There is no unanimity among courts regarding the precise elements of the defense. However, as the Supreme Court has observed, "Under any definition of [the defenses of duress and necessity] one principle remains constant: if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses will fail." *Id.* at 410, 100 S.Ct. at 635 (1980). The Court of Appeals for the First Circuit recently adopted the formulation of the elements of a duress defense established by the Court of Appeals for the Ninth Circuit:

> To maintain the defense of duress, a defendant must offer evidence sufficient to show three things: (1) that she acted under an immediate threat of serious bodily injury or death, (2) that she had a well grounded belief that the threat would be carried out, and (3) that she had no reasonable opportunity to escape or otherwise to frustrate the threat.

*United States v. Amparo,* 961 F.2d 288, 291 (1st Cir.) (citing *United States v. Johnson,* 956 F.2d 894, 897 (9th Cir.1992)), *cert. denied,* —— U.S. ——, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). The defendant's only burden under such a defense is to produce sufficient evidence to support a finding of duress. Once a defendant has produced such evidence, the Government must demonstrate beyond a reasonable doubt that the defendant's actions were *not* the product of coercion or duress. *Id.* The Court of Appeals for this circuit has stated that the Government may satisfy its burden by showing that, for example, "no threat occurred, or that the defendant's fear was unreasonable, or that the defendant had an opportunity to escape but did not exercise it." *Id.* The defense is not employed to demonstrate that a defendant lacked the requisite *mens rea* to be found guilty of the crime. Rather, "[t]he defense assumes that the defendant has voluntarily performed the criminal act." *Johnson,* 956 F.2d at 897.

Two federal appeals courts have addressed the applicability of evidence of battered woman syndrome in the case where a duress defense is raised. The Court of Appeals for the Ninth Circuit provided an extensive discussion of battered woman syndrome in *United States v. Johnson,* 956 F.2d 894 (9th Cir.1992). In that decision, the panel permitted consideration of expert testimony on battered woman syndrome and the defendant's "subjective vulnerability" to coercion when her sentence is determined under the Federal Sentencing Guidelines. U.S.S.G. § 5K2.12. The Government suggests that the case is inapposite to the matter pending before this Court since the focus of *Johnson* was the applicability of battered woman syndrome expert testimony to sentencing. As discussed below, however, the panel also discussed the applicability of a battered woman syndrome theory to a duress defense and appears to conclude that the two are not incongruous.

The Fifth Circuit in *United States v. Willis,* 38 F.3d 170 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2585, 132 L.Ed.2d 834 (June 19, 1995), upheld the trial judge's exclusion of expert testimony offered as a part of a duress defense to establish that the defendant there was a victim of battered woman syndrome. The Fifth Circuit standard for duress differs in some ways from that used by the Ninth and First Circuits but is essentially similar in its objective formulation of duress.[11] The *Willis* court concluded

proper characterization of battered woman syndrome.

11. The Fifth Circuit requires a defendant to show that she was "under an unlawful and present, imminent, and impending threat of such a nature

that an objective approach provides no occasion for consideration of "subjective" factors such as the fact that defendant suffers from battered woman syndrome. The panel stated that such expert testimony "is not addressed to whether a person of reasonable firmness would have succumbed to the level of coercion present in a given set of circumstances," but, rather, explains how the defendant was unusually susceptible to coercion. *Id.* at 175.[12]

The Fifth Circuit panel cited *Johnson* as persuasive authority to the extent that the Ninth Circuit panel upheld the convictions. *Id.* at 175. However, the admissibility of expert testimony during trial in a duress defense was not squarely before the appellate court in *Johnson.* One of the three defendants did present at trial expert testimony on battered woman syndrome, and that testimony was summarized in the text of the panel's opinion.[13] The court's discussion of the expert testimony in conjunction with that of the defendants in *Johnson,* however, indicates that the court did not consider evidence of battered woman syndrome to be *per se* excludable, as did the *Willis* court.

The *Johnson* court related the conclusions offered by the expert testimony on behalf of one of the defendants, including: "Repeated beatings diminish the battered woman's motivation to respond and instill in her a negative belief about the effectiveness of her actions. This 'learned helplessness' keeps the battered woman from leaving her batterer." *Johnson,* 956 F.2d at 899. The expert also explained how many battered women form certain "survival skills" such as "hyperalertness" to prevent further violence. "The de-

velopment of survival skills," the court noted, "comes 'at the expense of escape skills.' " *Id.* at 899 (quoting Lenore Walker, *The Battered Woman Syndrome* (1984)). The court also noted:

> Society often misinterprets the survival skills of battered women as signs of passivity and weakness coupled with an unwillingness to leave the violent relationship. A common misunderstanding is that the battered woman's responses are indicative of a weak character. Rather, these responses must be seen as attempts to cope with the abusive and controlling environment in which she lives and from which she is helpless to escape.

*Id.* (citation omitted).

In its analysis of the applicability of such evidence in a duress defense, the *Johnson* court noted that evidence of duress requires a fact-finder to determine whether a defendant's fear was "well-grounded" and her actions "reasonable" under the circumstances. *Id.* at 898. Accordingly, evidence that addresses a defendant's "special vulnerability to fear—a vulnerability not produced by those persons causing the defendant's criminal action"—is normally irrelevant to the objective reasonableness of her actions. *Id.* The panel considered the commentary in the *Model Penal Code,* stating that, although the law may acknowledge "stark, tangible factors that differentiate an actor from another," the law does not permit consideration of an individual's capacity to meet the norms set out in criminal law. *Id.* The court acknowledged, however, that despite the fact that the *Model Penal Code* drafters did not consider gender

---

as to induce a well-grounded apprehension of death or serious bodily injury" and that there was an absence of any legal alternative. *Willis,* 38 F.3d at 175. The Fifth Circuit test also requires a defendant show that she did not "recklessly or negligently place herself in a situation in which it was probable that she would be forced to choose the criminal conduct," and the existence of a "direct causal relationship" between the criminal action and the threatened harm. *Id.*

12. Both the *Willis* court and the Government here cite a Second Circuit decision, *United States v. Smith,* 987 F.2d 888 (2d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 209, 126 L.Ed.2d 165 (1993), as authority supporting the proposition that ex-

pert testimony on a "special vulnerability" to coercion is not relevant to a duress defense.

13. The trial court excluded the use of such evidence by the other two defendants to the extent that it did not permit them to elicit testimony for their own benefit from the expert called by the other defendant. This exclusion was upheld by the panel. *Johnson,* 956 F.2d at 901–02. The jury found guilty the defendant who did introduce the evidence of battered woman syndrome, which indicates that, for whatever reason, it concluded that the defendant was not abused or that, although she may have been abused, she nonetheless had a reasonable opportunity to escape her abuser.

to be one of the "stark, tangible factors," the panel concluded that it should be considered as such in certain circumstances. *Id.*

Although the court did not deny that battered woman syndrome evidence demonstrated an individual's particular vulnerability to duress, it also expressed reluctance to simply dismiss the applicability of such evidence to a duress defense. The court observed that the Model Penal Code, a model for many federal courts' application of the defense, expanded the scope of the duress defense beyond the strictly "objective" inquiry to include a case where

'by the continued use of unlawful force, persons effectively break down the personality of the actor, rendering him [or her] submissive to whatever suggestions they make. They then, using neither force nor threat of force on that occasion suggest that he [or she] perform a criminal act; and the actor does what they suggest.'

*Id.* at 900 (quoting *Model Penal Code* § 2.09, comment 3) (brackets in original). The court also noted that the *Model Penal Code* repeats the commentary of one treatise which stated that the duress defense "applies when the defendant is so far 'in thrall to some power' that a legal sanction would be ineffective in controlling any choice that may be made." *Id.* at 900 (quoting Glanville Williams, *Criminal Law: The General Part*, 755–62 (2d ed. 1961), *cited in Model Penal Code* § 2.09 n. 40).

The court concluded that courts should be wary of permitting the defense to be expand-

ed too far and, therefore, should permit such expansion only if linked to "gross and identifiable classes of circumstances. Battered women are in circumstances forming such a class." *Id.* (citation omitted). Therefore, the court left for another day the consideration of whether such evidence may be excluded when it is offered for the sole purpose of establishing a defense of duress. A later decision of the Ninth Circuit, however, left no doubt that in *Johnson,* the court considered "[t]he battered woman defense [to be] a species of the defense of duress." *United States v. Homick,* 964 F.2d 899, 905 (9th Cir.1992).

This Court is reluctant to join the Fifth Circuit in establishing a *per se* rule of excluding expert testimony that may be characterized as addressing battered woman syndrome. Part of the complexity of the issue is that the distinction between subjective and objective evidence is not as clear as the Government asserts here. This can be demonstrated by changing the "snapshot" of circumstances that is shown to a jury in any particular case. If the jury sees the defendant's circumstances immediately prior to commission of the crime and there is no gun held to her head or other markedly extreme duress, the jury may conclude that any fear of imminent death or violence was unreasonable.[14] However, if the defendant is permitted to pull the camera back to provide the broader picture, so to speak, of her circumstances, the jury could learn of a pattern of violence, control, and coercion leading up to the criminal act.[15] Expert testimony could

---

14. This is clearly the approach suggested in *Willis.* The court there characterized battered woman syndrome expert testimony as "explain[ing] why this particular defendant succumbed when a reasonable person without a background of being battered might not have." *Willis,* 38 F.3d at 175. The Court concludes that, in the context of a duress defense in which a defendant claims to have been coerced by her abuser to commit the crime, the exclusion of the history and *effect* of such abuse is wholly unfair and unjustified. The presentation of expert testimony need not state that *this particular defendant* suffered from the syndrome. Rather, the expert may simply explain the long-term effects of being battered in general.

15. The *Willis* panel appears to hold a similar view on this point:

In determining whether the elements of duress are met, the fact-finder may take into account the objective situation in which the defendant was allegedly subjected to duress. In addition to the immediate circumstances of the crime, this would include evidence concerning the defendant's past history with the person making the unlawful threat. In order to successfully make out this defense, a defendant must show, among other things, that her fear is well-grounded. A fear that seems irrational when viewed only in light of the immediate circumstances may be well-grounded if the defendant's experience with the person applying the threat is such that she can reasonably anticipate being harmed for her failure to comply.

*Willis,* 38 F.3d at 177–78 n. 8 (citation omitted). Presumably, the panel would permit evidence regarding a defendant's history of abuse but

be helpful to explain to the jury how a reasonable person reacts to repeated beatings and emotional abuse. Providing the jury with information of specific incidents of abuse while providing no information about how such treatment can, over time, establish a dynamic where the threat of abuse hovers over every interaction between the individuals, even if such threat is not always articulated, would give the jury only half of the story. In effect, this expert testimony may be characterized as explaining how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment.[16]

■ This Court has also found it helpful to examine the treatment by other courts of battered woman syndrome expert testimony as part of a self-defense theory, rather than a duress defense. The two defenses are similar in that they require a defendant to demonstrate that she acted reasonably in response to a reasonable fear of death or bodily injury. Self-defense, therefore, also requires an essentially objective analysis without consideration of factors such as mistake or good faith. *See, e.g., Hall v. United States,* 46 F.3d 855, 857 (8th Cir.1995) (A person is entitled to use "such force that [s]he reasonably believe[d] was necessary to protect [her]self from unlawful physical harm about to be inflicted upon [her] by another."); *United States v. Jackson,* 569 F.2d 1003,

1008 (7th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978) ("[A] person is justified in the use of force when and to the extent that [s]he reasonably believes that such conduct is necessary to defend [her]self against the imminent use of unlawful force.").

In state courts, where the law of self-defense is essentially the same as in federal courts in terms of requiring a showing of reasonable conduct by the defendant, there is almost unanimous agreement that defendants may present expert testimony regarding battered woman syndrome as part of their defense.[17] *See generally* 18 A.L.R.4th 1153 (1982 & Supp.1994). None of the courts surveyed by this Court engaged in a "subjective versus objective evidence" analysis in deciding on the admissibility of such evidence. Rather, many of these courts consider the evidence to be offered for the purpose of expanding jurors' general knowledge and understanding of precisely what circumstances the defendant was operating under at the time of the offense.

For example, one court reasoned that "[w]e do not believe the average juror is familiar with the complex behavior of a victim of [battered woman syndrome]" and that expert testimony in this field "has been used in other jurisdictions to explain how a battered woman reacts to the batterer, to explain the reasonableness of the battered woman's perception that danger or great

---

nonetheless exclude expert testimony to assist jurors in understanding the dynamics created by such abuse.

16. The Government asserts in its memorandum in support of this motion that evidence of battered woman syndrome should not be admissible until a defendant has made out a *prima facie* case, which, according to the Government, has not been done here. The Government then cites a series of "facts" to support this assertion. However, these facts are merely a recitation of the Government's case against Defendant. Defendant's allegations of abuse have not been provided (nor were they required) on the responsive filing on this motion. The absence of facts is precisely why this Court cannot determine definitively whether the proposed expert testimony is admissible. It would be entirely premature for the Court to take steps at this time to preclude Defendant from even attempting to make out a duress defense.

17. The Court could not find any federal court cases addressing the admissibility of battered woman syndrome expert testimony in a self-defense context in a federal criminal proceeding. This is not surprising since, at present, there are relatively few federal crimes, as compared with state crimes, to which self-defense would be a properly asserted defense. Accordingly, the Court has reviewed the development of the defense in state court self-defense cases. The Court of Appeals for the Eight Circuit, in *Arcoren v. United States,* 929 F.2d 1235 (8th Cir.), *cert. denied,* 502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 255 (1991), however, did discuss the extension of battered woman syndrome testimony beyond the self-defense context. In that case, the court ruled that such evidence could be admitted when offered by the government to explain why a key witness changed her testimony and the panel saw no reason to limit such evidence "to cases in which it is offered to bolster a claim of self-defense." *Id.* at 1241.

bodily harm is imminent, and also to rebut the prosecution's inference that the defendant could have left rather than kill the spouse." *People v. Wilson,* 194 Mich.App. 599, 487 N.W.2d 822, 824 (1992). Another court suggested an objective test of the "reasonably prudent battered [woman]," and concluded that evidence of the effects of domestic violence are admissible "just as it is admissible to prove the standard mental state of hostages, prisoners of war, and others under long-term life-threatening conditions." *State v. Hundley,* 236 Kan. 461, 693 P.2d 475, 479 (1985).

■ Courts have also noted that battered woman syndrome evidence is significant since it operates to dispel many commonly held myths regarding domestic violence. *See, e.g., Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772, 783 (1989) ("It is widely acknowledged that commonly held beliefs about battered women are subject to myths that ultimately place the blame for battering on the battered victim."); *State v. Kelly,* 97 N.J. 178, 478 A.2d 364, 377 (1984) ("[T]he experts point out that one of the common myths, apparently believed by most people, is that battered [women] are free to leave."). Courts permit such evidence to be admitted to expand the common sense and general knowledge that all jurors are presumed to bring with them into the jury room. When considering self-defense in other contexts, such as "barroom brawls" or protecting one's family from an intruder, jurors are expected to readily apply their understanding of the dynamics of a given situation to the evidence under their consideration. Without an understanding of how battered woman syndrome instills in an abused person a continuing sense of being trapped and of constant fear, the jurors' review of a defendant's allegations that she was in fear of immediate bodily injury will be incomplete and irrelevant to the reality of the situation.

In effect, bringing the discussion and understanding of intrafamily violence out into the open places a scenario long considered a closely-guarded "private family matter" on the same footing as other forms of violence leading to criminal acts in self-defense or resulting from duress. *See, e.g., Hawthorne v. State,* 408 So.2d 801, 806 (Fla.App.1982) ("The expert testimony would have been offered in order to aid the jury in interpreting the surrounding circumstances as they affected the reasonableness of her belief.... It is precisely because a jury would not understand why appellant would remain in the environment that the expert testimony would have aided them in evaluating the case."); *State v. Allery,* 101 Wash.2d 591, 682 P.2d 312, 316 (1984) ("We find that expert testimony explaining why a person suffering from the battered woman syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself would be helpful to the jury in understanding a phenomenon not within the competence of an ordinary lay person.").

This Court cannot envision that such evidence should be excluded in a duress defense when it is admitted in an overwhelming majority of state courts in self-defense cases. Indeed, one court noted specifically in a duress case that it was extending the rule from self-defense cases permitting such evidence. *People v. Romero,* 13 Cal.Rptr.2d 332, 338 (Cal.Ct.App.1992) ("As relevant to this case, the defense of duress is the same as self-defense—in both, the key issue is whether the defendant reasonably and honestly believed she was in imminent danger of great bodily harm."), *rev'd on other grounds,* 8 Cal.4th 728, 35 Cal.Rptr.2d 270, 883 P.2d 388 (1994).[18]

However, in the record provided to the Court on this motion, the Court has no way to determine what will be the specific focus

---

18. Although the *Romero* opinion suggests that California's tests for self-defense and duress have both an objective and subjective component, the reasoning of the court is just as applicable to the federal criminal law where the essential elements of the defenses are identical.

In addition, the Court notes that, pursuant to California civil rules, the California Court of Appeal decision may not be cited as authority for the propositions in the opinion since it was later reversed on other grounds by the California Supreme Court. The Court cites it here merely to demonstrate the approach taken by one of the few appellate courts addressing the issue of battered woman syndrome and duress.

of Ms. Campbell's testimony. The Government attempts to label it as purely "subjective" testimony, as was done in *Willis*, while Defendant states that the evidence will assist the jury in determining whether Defendant's fear was well-grounded and will not address Defendant's "subjective condition." Defendant represents that the expert testimony will "provide the jury with psychological information, scientific evidence, and sociological data to show how reasonable persons react in similar circumstances." Defendant's Memorandum in Opposition to Government's Motion *In Limine* (Docket No. 27) at 12. Defendant also asserts in her memorandum to the Court that the expert will explain the process by which Defendant was rendered entirely submissive to her boyfriend through physical and emotional abuse.

In order to properly rule on the admissibility of this evidence, however, and determine the relevance of, as well as any unreasonable prejudice from, the proposed testimony, the Court must know precisely what testimony will be offered. Accordingly, the Court orders Defendant to submit a proffer of evidence of the anticipated content of the expert testimony regarding the defense of duress at least ten (10) days in advance of trial. As discussed in the previous section regarding evidence of a mental disease or defect, this motion is denied with prejudice to the arguments asserted by the Government here (*i.e.*, that expert testimony battered woman syndrome is irrelevant to and inadmissible in a duress defense *per se* ). However, the Government is not precluded from objecting to the admissibility of such evidence on other bases.

### C. Motion for Discovery

The Government has also asked this Court to permit certain discovery in the event that Defendant is permitted to proceed with expert testimony regarding a mental defect or battered woman's syndrome. Specifically, the Government asks the Court to order Defendant to provide any reports of mental or physical examinations or tests and also to order Defendant to submit to a psychiatric examination by a "government expert." At this time, the Government is entitled to none of this proposed discovery.

 The Government's primary argument for discovery of the results of any examinations or tests is that it is entitled to such items under Rule 16(b)(1)(B). A prerequisite to any obligation of Defendant to provide discovery under that rule is that the Defendant had requested discovery under Rule 16(a)(1)(C) or (D) and that the Government has complied with such request.[19] The Government argues here that this prerequisite has been satisfied since Defendant submitted a written discovery request, with which the Government has complied. Specifically, the Government contends that Defendant's request for "[a]ny computer printout of the contents of a police radio call made in connection with this case" constitutes a request for a "document" under Rule 16(a)(1)(C), and the Government's compliance with that request triggered Defendant's reciprocal obligation.

Defendant responds that her request was limited to items she is entitled to receive under the principle in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," and, accordingly, the opinion established an obligation of prosecutors to provide all exculpatory information to a defendant prior to her trial. *Id.* at 87, 83 S.Ct. at 1196–1197. Although *Brady* did not establish a discovery rule, it nevertheless "has important implications for discovery." 2 Charles Alan Wright, *Federal Practice and Procedure* § 254 at 78 (1982).

---

**19.** The rule provides, in pertinent part:
 If the defendant requests disclosure under *subdivision (a)(1)(C) or (D) of this rule, upon* compliance with such request by the government, the defendant, on request of the government, shall permit the government to inspect and copy or photograph any results or reports of physical and mental examinations ... in connection with the particular case....
 Fed.R.Crim.P. 16(b)(1)(B).

■ The Court has observed that the general practice in criminal proceedings *before this Court* is that parties voluntarily exchange all material in their possession in advance of trial in the spirit of reciprocity and cooperation. This practice has resulted in the efficient and fair preparation for and adjudication of criminal proceedings. It also operates in such a way that the Court is rarely obligated to step in and rule on the scope and application of a particular discovery rule. Unfortunately, this case appears to be one of the exceptions to that practice.

The Court has reviewed the correspondence of the parties submitted on this motion and concludes that, although Defendant's request was broad and the Government's response was generous, it does not appear that Defendant sought discovery in a manner that would trigger her obligation under Rule 16(b). Although this Court does not interpret the discovery rules to require all Rule 16(a) requests to be formal written documents specifically citing to Rule 16 or its language,[20] it is clear in this case that Defendant sought only that discovery to which she was entitled under the principles of *Brady*. Such a request may result in the production of a broad range of documents and items, since exculpatory information may be in varied forms, but the mere fact that such discovery is sought and provided does not trigger a reciprocal obligation under Rule 16(b). It would be inequitable to conclude that the exercise of her constitutional rights can operate to require Defendant to provide extensive information, including reports of mental examinations, which the rules do not otherwise require her to produce. Part of a defendant's strategy in the preparation of a criminal defense is consideration of whether to seek discovery under Rule 16(a) in light of the reciprocal obligation under Rule 16(b) that will be triggered by the Government's compliance with such a request. The discovery rules should not be interpreted in such a way as to require a defendant to give pause when considering whether to exercise her constitutional rights to obtain all exculpatory information.

■ The Government is not entitled to the discovery sought here on another basis as well. The Government seeks copies of reports of examinations and tests administered to Defendant by any expert witness and, if no such reports exist, the notes taken by such experts of their interviews of Defendant. Under Rule 16(b)(1)(B), a defendant must permit the Government

> to inspect and copy or photocopy any *results or reports* of physical or mental examinations and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, which the defendant intends to introduce as evidence in chief at the trial or which were prepared by a witness whom the defendant intends to call at the trial when the results or reports relate to that witness' testimony.

Fed.R.Crim.P. 16(b)(1)(B) (emphasis added). Defendant has reportedly informed the Government that neither of the proposed expert witnesses have prepared reports in this matter. The Government argues that it is nonetheless entitled to any of the experts' notes of their interviews with Defendant. There is nothing in the language of the rule that requires a defendant to produce an expert's notes of an examination. The notes taken during an interview, particularly a mental examination, are merely the raw data from which the expert may later draw the conclusions that are noted in a report or test result. *See United States v. Dennison*, 937 F.2d 559, 566 (10th Cir.1991) (doctor's notes of interview with the defendant do not constitute medical reports but are simply statements by a defendant to an agent), *cert. denied*, 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992); *United States v. Layton*, 90 F.R.D. 520 (N.D.Cal.1981) (tapes of interviews with defendant are raw material). Accordingly, under either analysis, the Government is not

---

**20.** *See United States v. Thuna*, 103 F.R.D. 182, 183–84 (D.P.R.1984) (noting that discovery requests under Rule 16 need not be formal documents and that a defendant's informal discovery request could operate to trigger a reciprocal discovery obligation once the Government complied with such request).

entitled to the requested discovery at this time.[21]

■ Finally, this Court concludes that the Defendant may not be compelled to submit to a psychiatric examination under the discovery rules. Rule 12.2(c) permits a mental examination of a defendant in an "appropriate case ... pursuant to 18 U.S.C. [§§] 4241 or 4242." Fed.R.Crim.P. 12.2(c). The statutory references in that provision address only the determination of mental competency to stand trial and the determination of the existence of insanity at the time of the offense, two scenarios with no relevance to these proceedings. The Government argues that despite this language, the only reasonable interpretation of this rule provides that such an examination may be ordered since Defendant was required to provide advance notice to the Government of *any* intention to produce evidence of "a mental disease or defect," and not merely in the context of competency to stand trial or as part of an insanity defense.

This Court, however, is loathe to submit Defendant to a psychiatric examination against her will in the absence of express statutory or administrative authority and without evidence that such an examination would serve any purpose. The fact that such an examination will assist the Government, which has the greater burden of proof on the *mens rea* issue, does not provide a basis for this Court to help "even the playing field." The statutes and rules establish the proper procedure for allocating burdens, rights, and obligations in federal criminal proceedings, and this Court sees no reason to stray from

applying the sense and prudence of such rules and laws here.[22]

### *III. CONCLUSION*

Accordingly, the Court *DENIES* the Government's Motion In Limine or for Discovery. The Court further *ORDERS* Defendant to submit, no less than ten (10) days prior to the commencement of trial in this matter, a written proffer of evidence of the anticipated content of the expert testimony described in Defendant's Rule 12.2 notice, as set forth hereinbefore.

So *ORDERED.*

21. Both parties have acknowledged that any reports or statements prepared by any expert testifying at trial become discoverable under Rule 26.2 *immediately after* the conclusion of such testimony and could result in a suspension of the trial while the Government reviews such reports and prepares its cross-examination.

22. The Court has reviewed the cases submitted by the Government on this issue but finds none to be persuasive authority here. The trial court's interpretation of Rule 12.2(c) in *United States v. Vega–Penarete,* 137 F.R.D. 233 (E.D.N.C.1991), is, in this Court's opinion, off the mark. The language of the advisory committee quoted in that opinion stating that "expert testimony about the defendant's mental condition may be tendered in a wide variety of circumstances," was

clearly making reference to the fact that such testimony is not always provided in the situation envisioned under the former Rule 12.2(b), which addresses *expert testimony,* where "a psychiatrist testifies for the defendant regarding his diminished capacity," and is not in reference to a *compelled examination* pursuant to Rule 12.2(c). Fed.R.Crim.P. 12.2 advisory committee's note. The remark in the paragraph that follows discussing Rule 12.2(c) was to state that the rules now reflect "that the government may seek to have defendant subjected to a mental examination by an expert other than a psychiatrist." *Id.* The analysis in *United States v. Banks,* 137 F.R.D. 20 *(C.D.Ill.1991),* relies upon essentially the same flawed reasoning.